UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ZAN SUN** and **QING LING CHENG**, | |
| *Plaintiffs*, | |
| v. | |
| **SHEN YUN PERFORMING ARTS, INC., FEI TIAN COLLEGE, FEI TIAN ACADEMY OF THE ARTS, DRAGON SPRINGS BUDDHIST INC., HONGZHI LI,** and **RUI LI**, | Case No. 7:25-cv-03185 |
| *Defendants.* | |

MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) and 12(b)(6)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS...............................................................................................1

ARGUMENT...................................................................................................................5

I.   Both Plaintiffs' Claims Are Barred by the Statute of Limitations. ........................5

II.  All of Plaintiffs' Claims Fail Because the Complaint Does Not Plausibly
     Allege That Defendants Knowingly or Intentionally Used Threats of
     Serious Harm to Obtain Labor in Violation of 18 U.S.C. § 1589(a).....................7

III. The Ministerial Exception Bars Plaintiffs' Claims.............................................12

IV.  Plaintiffs Fail to Meet the Pleading Requirements of Rule 8...............................16

     A.  Plaintiffs Impermissibly Bundle All Defendants Together.............................16

     B.  The Complaint Relies on Vague, Uncorroborated, and Obviously
         Inadmissible Statements Relating to Students other than Plaintiffs...............17

V.   Plaintiffs' Other TVPRA Claims Fail. ...............................................................18

     A.  There Was No "Forced Seizure of Documents."............................................19

     B.  The Claim of Vicarious Liability Is Not Adequately Pleaded. ......................20

     C.  The Claims of Beneficiary Liability Are Insufficient. ..................................23

     D.  The TVPRA Did Not Establish Civil Liability for Conspiring or
         Attempting to Benefit from Forced Labor During the Relevant Time
         Period.......................................................................................................23

     E.  In Any Event, the Complaint Does Not Adequately Plead a Conspiracy
         Claim.......................................................................................................24

VI.  Plaintiffs Lack Standing to Seek Prospective Relief............................................25

CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, 2021 WL 7186030 (E.D.N.Y. Apr. 30, 2021) ..............24

*Alcazar v. Corp. of Catholic Archbishop of Seattle*, 627 F.3d 1288 (9th Cir. 2010) ........................................13

*Alicea–Hernandez v. Cath. Bishop of Chi.*, 320 F.3d 698 (7th Cir. 2003)........................................................13

*Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130 (2d Cir. 1997).........................................................21

*Am. Protein Corp. v. AB Volvo*, 844 F.2d 56 (2d Cir. 1988) ........................................................................22

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011)..........................................................5

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)...........................................................................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................................... 5, 20

*Atuahene v. City of Hartford*, 10 F. App'x 33 (2d Cir. 2001)................................................................ 16, 17

*Baxla v. Chaudhri*, 225 F. Supp. 3d 588 (E.D. Va. 2016)..................................................................... 24, 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................................5, 24, 25

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ..........................................................................................11

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335 (S.D.N.Y. 2013).................21

*Carson as next friend of O. C. v. Makin*, 596 U.S. 767 (2022) ......................................................................10

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47 (2d Cir. 2016).......................................................................5

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 145 S.Ct. 1583 (2025)............................16

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .......................................................................5

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018)....................................................................18

*Cruz v. Maypa*, 773 F.3d 138 (4th Cir. 2014)............................................................................................20

*Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340 (2d Cir. 1998) ....................................................25

*Doe 1 v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024) ..........................................................................25

*EEOC v. Diocese of Raleigh*, 213 F.3d 795 (4th Cir. 2000) ...................................................... 13, 14

*EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377 (E.D.N.Y. 2016) .............................15

*Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847 (2d Cir. 1961) ...........................................................16

*Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044 (2d Cir. 1997) ..............................................21

*Gonzales v. 0 Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ...........................11

*Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006) .................................................................................11

*Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012) ........................................ 7, 8, 9, 11, 12

*Headley v. Church of Scientology Int'l*, No. CV 09-3986 DSF(MANX), 2010 WL 3157064 (C.D. Cal. Aug. 5, 2010), *aff'd*, 687 F.3d 1173 (9th Cir. 2012) ..........................................................13

*Hyman v. Rosenbaum Yeshiva of N. Jersey*, 474 N.J. Super. 561 (App. Div. 2023) .............................10

*In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008), *aff'd* 730 F.3d 170 (2d Cir. 2013) .............................................................................................................20

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69 (2d Cir. 1995) (*per curiam*) ......................5

*Int'l Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430 (2d Cir. 1981) ...........................15

*Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94 (1952) .................................................................11

*Lagayan v. Odeh*, 199 F. Supp. 3d 21 (D.D.C. 2016) ................................................................ 24, 25

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ...........................................................................23

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp., LLC*, 268 F.3d 58 (2d Cir. 2001) ......................21

*Malnak v. Yogi*, 592 F.2d 197 (3d Cir. 1979) (Adams, J., concurring) ....................................................15

*Mangiafico v. Blumenthal*, 471 F.3d 391 (2d Cir. 2006) .....................................................................5

*Martin v. SS Columba-Brigid Cath. Church*, No. 1:21-CV-491, 2022 WL 3348382 (W.D.N.Y. Aug. 12, 2022) ....................................................................................................................14

*Minker v. Baltimore Annual Conference of the United Methodist Church*, 894 F.2d 1354 (D.C. Cir. 1990) ........................................................................................................................13

*Moreira v. Société Générale, S.A.*, 125 F.4th 371 (2d Cir. 2025) .......................................18

*Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017), *as amended* (Mar. 3, 2017).............8, 12, 20

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020) ................10, 12, 13

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875 (9th Cir. 1987) .....................11

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925).........................................................................12

*Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159 (9th Cir. 2022) ......................................24

*RCM Securities Fund, Inc. v. Stanton*, 928 F.2d 1318 (2d Cir. 1991) ...............................23

*Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503 (S.D.N.Y. 2015) ...................................21

*Roe v. St. John's Univ.*, 91 F.4th 643 (2d Cir. 2024) ................................................................5

*S.M. v. Clash*, 558 F.App'x 44 (2d Cir. 2014).........................................................................6

*Schorr v. Dopico*, 205 F. Supp. 3d 359 (S.D.N.Y. 2016), *aff'd*, 686 F. App'x 34 (2d Cir. 2017) ..............18

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299 (4th Cir. 2004) ..............13, 15

*Shan Zhu Qiu v. Holder*, 611 F.3d 403 (7th Cir. 2010) ..........................................................2

So-Ordered Stipulation of Settlement, *Dragon Springs Buddhist, Inc., v. Town of Deerpark, et al.*, No. 7:13-cv-05968-VB (S.D.N.Y. June 26, 2014) ............................................................3

*Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34 (2d Cir. 2023) ...............................25

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008) ...........................13

*Starkman v. Evans*, 198 F.3d 173 (5th Cir. 1999) .................................................................14

*Strojmaterialintorg v. Russian Am. Commercial Corp.*, 815 F. Supp. 103 (E.D.N.Y. 1993) ..........................21

*Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236 (2d Cir. 2017)........................................5

*Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012) ..........................14

*Torcaso v. Watkins*, 367 U.S. 488 (1961) ....................................................................................................15

*United States v. Dann,* 652 F.3d 1160 (9th Cir. 2011).................................................................................8

*United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014) .......................................................................10, 12

*Watson v. Jones*, 80 U.S. 679 (1872) .........................................................................................................16

*Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315 (2d Cir. 2021) ....................................................................13

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ...................................................................................................10

*Zhang Jingrong v. Chinese Anti-Cult World All.*, 311 F. Supp. 3d 514 (E.D.N.Y. 2018), *rev'd on other grounds* 16 F.4th 47 (2d Cir. 2021) ........................................................................................1, 2, 15

## Statutes

18 U.S.C. § 1589...........................................................................................................7, 8, 12, 18, 23

18 U.S.C. § 1590.....................................................................................................................................18

18 U.S.C. § 1592(a)(1).................................................................................................................18, 19, 20

18 U.S.C. § 1594..............................................................................................................................18, 24

18 U.S.C. § 1595(a) .........................................................................................................................23, 24

18 U.S.C. § 2255......................................................................................................................................6

Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117-347 § 101, 136 Stat. 6199, 6200 (2023)..........................................................................................................................................23

Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, Pub.L. 115-126, Title I, § 102, Feb. 14, 2018, 132 Stat. 319 ..................................................................6

The Child Abuse Victims' Rights Act of 1986, Pub.L. 99–591 (October 30, 1986), 100 Stat 3341 ................................................................................................................................................6

The Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb–2000bb-4 ............................11

Trafficking Victims Protections Reauthorization Act of 2003, Pub. L. No. 108-193, Dec. 19, 2003, 117 Stat. 2875 ................................................................................................................8

## Rules

Federal Rule of Civil Procedure 8 ................................................................................................ 18, 23

## Other Authorities

"Day in the Life of a Ballet Student," Pittsburgh Ballet Theater (May 17, 2017), https://pbt.org/blog/day-life-ballet-student/....................................................................10

Ballet Magnificat, *Our Story*, https://www.balletmagnificat.com/about-story ....................................15

China Tribunal, *Final Judgment: Short Form Conclusion* (June 17, 2019), https://chinatribunal.com/final-judgment/ ...................................................................2

New England Commission of Higher Education, Fei Tian College: Accreditation Details, https://www.neche.org/institutions/fei-tian-college/............................................................3

New York State Department of Education, Institution Data: Fei Tian Academy of the Arts, https://portal.nysed.gov/pls/sedrefpublic/sed_inst_qry$inst.queryviewbykey?P_INST_ID=800000060088&Z_CHK=41056....................................................................................3

Shen Yun Performing Arts Inc: Full Text of "Full Filing" for Fiscal Year Ending Dec. 2023, ProPublica, https://projects.propublica.org/nonprofits/organizations/208812402/202421039349300 917/full (last updated Mar. 27, 2025)......................................................................... 2, 3, 14

Stephanie Slade, *The Pope Who Helped Bring Down Communism*, Reason.com (Nov. 20, 2021), https://reason.com/2021/11/20/the-pope-who-helped-bring-down-communism/ ....................16

The Tabernacle Choir, *Our History*, https://www.thetabernaclechoir.org/who-we-are?lang=eng................................................................................................................................15

## INTRODUCTION

For nearly 20 years, Shen Yun, a music and dance ministry of Falun Gong, has been dedicated to sharing traditional Chinese culture and the message of Falun Gong worldwide. Shen Yun's dancers are elite performers who choose to make the high degree of physical and mental commitment that many aspiring dancers around the world make, but Shen Yun adds to that the spiritual commitment to share Falun Gong's message of Truth, Compassion, and Forbearance through their dance.

Plaintiffs once desired to be a part of this exclusive and dedicated group. They and their parents sought their admission to Fei Tian Academy so that they could study and practice, with the goal of becoming Shen Yun dancers. Persevering after failed auditions, Plaintiffs won admission to the Academy and, eventually, succeeded in dancing with Shen Yun.

Plaintiff Sun, however, was eventually expelled from Fei Tian College; and Plaintiff Cheng was not accepted for admission to the College. Plaintiffs nevertheless continued to volunteer for a Shen Yun presenter and other Falun Gong organizations for several years. But now, Plaintiffs are reframing their experiences to portray them in a twisted light. Their allegations show nothing more than that their parents enrolled them in religious dance schools so that they could become messengers of Falun Gong. And they are suing over experiences common to religious boarding schools and elite dance academies around the country. The Court should dismiss their claims because they are time-barred and because they do not make out any violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"). Ultimately, what they allege amounts to nothing more than rejection of their religious upbringing and their past dedication to spreading the message of Falun Gong.

## STATEMENT OF FACTS

Falun Gong is "closely related" to Buddhism. *Zhang Jingrong v. Chinese Anti-Cult World All.*, 311 F. Supp.3d 514, 559 (E.D.N.Y. 2018), *rev'd on other grounds* 16 F.4th 47 (2d Cir. 2021). Defendant Li Hongzhi founded Falun Gong (also called Falun Dafa) in 1992, authoring the "main corpus of Falun

Gong beliefs, Zhuan Falun." *Id.* at 525; Complaint ("Compl.") ¶ 17. "Falun Gong has many traditional

hallmarks of a religion: (1) a leader, (2) foundational texts, (3) a path to salvation, (4) holidays, (5) belief

in a higher being, and (6) dietary restrictions," as well as a metaphysical realm. *Zhang,* 311 F.Supp. 3d

at 525, 559–60. It is therefore considered a religion under U.S. law. *Id.*

"Falun Gong is strictly prohibited by the Chinese government." *Shan Zhu Qiu v. Holder*, 611 F.3d

403, 404 (7th Cir. 2010). Although Falun Gong was originally practiced openly, the Chinese

government outlawed it in 1999 as "heretical" after practitioners held a large, peaceful demonstration

in Beijing to protest police harassment. *Zhang,* 311 F. Supp. 3d at 531. Falun Gong adherents face

severe persecution in China, including imprisonment in "reeducation" labor camps, torture, and

forced organ harvesting. *See Shan Zhu Qiu*, 611 F.3d at 407 ("The 2006 State Department Report on

Human Rights in China catalogs … beatings, deaths, and disappearances of Falun Gong advocates …

and it also notes that Falun Gong practitioners and their families are targeted for arbitrary arrest,

detention, and harassment."); China Tribunal, *Final Judgment: Short Form Conclusion* (June 17, 2019),

https://chinatribunal.com/final-judgment/ ("Forced organ harvesting has been committed for years

throughout China on a significant scale and Falun Gong practitioners have been one – and probably

the main – source of organ supply.").

Shen Yun Performing Arts, Inc., is a § 501(c)(3) organization whose mission is "to carry forward

the goodness of [Falun Dafa] and [the] universal principle[s] of Truth, Compassion, and Forbearance.

To bring together talented artists of different nationality to revive the true, five-millennia-old artistic

tradition." Compl. ¶ 33 n.1 (citing Shen Yun Performing Arts Inc: Full Text of "Full Filing" for Fiscal

Year Ending Dec. 2023, ProPublica (last updated Mar. 27, 2025) (hereinafter "SY 990")).[1] Shen Yun

performances feature classical Chinese dance accompanied by Western classical and traditional

---

[1]  Available at https://projects.propublica.org/nonprofits/organizations/208812402/202421039349300917/full.  The
Complaint selectively quotes from Shen Yun's Form 990, omitting the portion that describes the organization's religious
mission. *See* page 14, *infra.*

Chinese instruments. Compl. ¶ 34. Through music and dance, Shen Yun instantiates and presents Falun Gong principles, ultimately seeking the salvation of its audience. Compl. ¶¶ 58, 63; SY 990. In keeping with its mission to spread the message of Falun Gong, Shen Yun performances include scenes designed to raise awareness of the persecution of Falun Gong practitioners in China. Compl. ¶ 36. Falun Gong scriptures and material are made available to performance attendees. Compl. ¶ 37.

Dragon Springs Buddhist, Inc., is a nonprofit organization (recognized by the IRS as a church)[2] operating a 400-acre property in Orange County, New York. Compl. ¶¶ 16, 28. It features three traditionally constructed Buddhist temples and is considered a Place of Worship under local zoning law. So-Ordered Stipulation of Settlement, *Dragon Springs Buddhist, Inc., v. Town of Deerpark,* et al., No. 7:13-cv-05968-VB (S.D.N.Y. June 26, 2014). The property is also home to Shen Yun and the Fei Tian schools. Compl. ¶ 28.

Fei Tian Academy of the Arts is a § 501(c)(3) religious secondary boarding school specializing in performing arts, Compl. ¶¶ 15, 24. It was granted an Absolute Charter by the New York State Board of Regents in 2009,[3] and the IRS considers it the integrated auxiliary of a church.[4] Fei Tian College is a § 501(c)(3) religious post-secondary educational institution also specializing in performing arts, Compl. ¶¶ 14, 26, and accredited by the New England Commission of Higher Education to offer both baccalaureate and master's degrees.[5] The Academy and College students and Shen Yun participants are Falun Gong co-religionists who participate in daily religious study and exercise. Compl. ¶¶ 39, 70. As religious schools dedicated to inculcating Falun Gong, the two schools require students to adhere to a code of conduct consistent with their faith, which restricts contact between boys and girls and

---

[2] IRS Determination letter, attached as Exhibit A.
[3] New York State Department of Education, Institution Data: Fei Tian Academy of the Arts, https://portal.nysed.gov/pls/sedrefpublic/sed_inst_qry$inst.queryviewbykey?P_INST_ID=800000060088&Z_CHK=41056.
[4] IRS Determination Letter, attached as Exhibit B.
[5] New England Commission of Higher Education, Fei Tian College: Accreditation Details, https://www.neche.org/institutions/fei-tian-college/.

limits access to materials contrary to Falun Gong principles (such as pornography). Compl. ¶¶ 46–49, 51. The schools also have safety protocols, such as requiring students to obtain permission before leaving campus. Compl. ¶¶ 44–45. Although boarding school students are not allowed smartphones, they may have conventional phones, iPods, and regulated internet access. Compl. ¶ 46. Qualifying Fei Tian students have the opportunity to perform with Shen Yun. Compl. ¶ 24.

Both Plaintiffs Sun and Cheng are children of New Zealand Falun Gong practitioners. Compl. ¶¶ 62, 93. Their parents enrolled them in Fei Tian Academy. *Id.* Because "Sun and his parents understood Shen Yun to be crucial to the Falun Gong practice," he auditioned twice over two years before qualifying to join. *Id.* ¶ 63. Sun attended Fei Tian Academy and College and performed with Shen Yun from 2008 to 2015, ultimately becoming a principal dancer. *Id.* ¶¶ 64, 73, 89. Sun alleges that he suffered performance-related injuries but remained because he "believed that should he leave, he would die within a month, go to hell, … experience a fate worse than hell," or suffer misfortune or disease. *Id.* ¶¶ 84, 86. He was expelled from Fei Tian College in 2015 because he violated the school's code of conduct. *Id.* ¶ 89. Despite his allegedly negative experience at the schools and as a performer, however, Sun volunteered with a Shen Yun presenter and Falun Gong advocacy organizations for years after leaving the United States. *Id.* ¶¶ 90–92.

Plaintiff Cheng also sought to participate in Shen Yun because of its role in furthering Falun Gong. Compl. ¶¶ 93, 95. She persisted in applying to Fei Tian Academy through three failed auditions over two years, eventually gaining admission. *Id.* ¶¶ 96–98. She attended the Academy from 2010 to 2015, and performed with Shen Yun from 2013 to 2015. *Id.* ¶¶ 99, 108–10, 124. Cheng believed that giving up performing in Shen Yun "would be a fate worse than death." *Id.* ¶ 113. She returned to New Zealand after she was rejected for admission to Fei Tian College, *id.* ¶ 124, but volunteered for years for a Shen Yun presenter and a Falun Gong-affiliated media organization. *Id.* ¶ 125.

Almost 10 years after leaving Shen Yun, Plaintiffs brought civil forced labor and related claims

4

under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1589–97.

## LEGAL STANDARD

Defendants move to dismiss Plaintiffs' Complaint under both FRCP 12(b)(1) and (6). On a motion to dismiss, the Court may consider the complaint, documents attached or incorporated by reference, matters of public record subject to judicial notice, and any document that, because "the complaint 'relies heavily upon its terms and effect,' [is] 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (*per curiam*)); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006); *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017).

Claims are subject to dismissal under FRCP 12(b)(6), however, where the plaintiffs would be unable to prevail even taking the well-pleaded allegations in the complaint as true. *See id.* "A complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Legal conclusions presented as factual statements are not presumed to be true. *Id.* (a complaint must have "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *Ashcroft v. Iqbal,* 556 U.S. 662, 678–79 (2009).

In considering motions under FRCP 12(b)(1), "[t]he task of the district court is to determine whether the pleading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'" *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (alterations in original)).

## ARGUMENT

### I. Both Plaintiffs' Claims Are Barred by the Statute of Limitations.

The time within which civil actions may be brought under the Trafficking Victims Protection Act,

18 U.S.C. § 2255, has changed over the years. The original version of the statute, enacted in 1986, provided that "Any action commenced under this section shall be barred unless the complaint is filed within six years after the right of action first accrues or in the case of a person under a legal disability, not later than three years after the disability." Pub. L. No. 99-591 (October 30, 1986), 100 Stat 3341. The "disability" of age ends upon turning 18. *See S.M. v. Clash*, 558 F. App'x 44, 45 (2d Cir. 2014).

In February 2018, an amendment to the law extended the time period from six years to ten. Pub. L. No. 115-126, Title I, § 102, Feb. 14, 2018, 132 Stat. 319. And the statute remained thus until a further amendment in 2023.[6] Plaintiff Sun turned 18 no later than 2011 (Compl. ¶ 62), and Plaintiff Cheng became 18 years old in 2014 (*id.* ¶ 99). Therefore, a complaint for any incident that occurred before February 2018 was time-barred no later than February 2024. This action was filed on April 17, 2025.

Sun claims that he was mistreated as a performer in Shen Yun dance training and presentations from May 2008 to May 24, 2015 (Compl. ¶¶ 65–66, 89), and Cheng alleges that she suffered the same from June 4, 2010, to mid-June 2015 (*id.* ¶¶ 99, 123). Sun left Dragon Springs in May 2015 (*id.* ¶ 89), and Cheng stopped dancing with Shen Yun in June 2015 (*id.* ¶ 123). Even if the 2018 TVPRA amendment were retroactive, applying to potential claims that had already accrued (and there is no indication that Congress intended such a reading), the only periods within the permissible ten-year span were approximately five weeks (April 17 to May 24, 2015) for Sun, and about two months (April 17 to "a few days after" June 18, 2015) for Cheng.[7] Yet the Complaint alleges nothing that happened to either Plaintiff in the spring of 2015 that could constitute a violation of the TVPRA. The most recent grievance among the litany cited by Cheng happened in 2013 (Compl. ¶ 108), while Sun mentions only that he was "forced" to delete his social media account "in or around 2015" (*id.* ¶ 88).

---

[6] While the TVPRA was amended in January 2023 by the Abolish Trafficking Reauthorization Act to eliminate the limitation period for claims by minors, the amendment is not retroactive. *See* Section VI(D), *infra*.

[7] The Complaint reports that both Plaintiffs continued to work at or for Shen Yun in capacities other than as dancers: Sun as a dance instructor in Taiwan and then as a ticket seller and a newspaper employee in New Zealand, and Cheng in "the costume factory" at Dragon Springs, and then in New Zealand. Compl. ¶¶ 91–92, 125. But the Complaint offers no suggestion that either of them was mistreated by Defendants in those roles.

"[A] plaintiff alleging a pattern of actionable conduct may rely on conduct falling outside the statute of limitations period …, 'so long as the final actionable event occurred within' [that period]." *Truman v. Brown*, 434 F. Supp. 3d 100, 118 (S.D.N.Y. 2020) (cleaned up) (citing *Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 630–32 (E.D.N.Y. 2012). But the Complaint contains no assertions of TVPRA violations within the ten years before this action was filed.

Nor does the Complaint suggest any reason for either Plaintiff's delay in bringing this action. Sun says that he suffered very serious and untreated injuries in 2008 (Compl. ¶¶ 67, 80) and "in or around" 2010, 2012, and 2014 (*id.* ¶¶ 82–85), but the most recent of these was well over 10 years prior to initiation of this lawsuit. Cheng too claims that she "sustained serious injuries" (*id.* ¶¶ 114–20), but all of them allegedly happened in or before 2011. One of these incidents, she claims, left her shoulder "permanently damaged" (*id.* ¶ 119). Yet she inexplicably waited some 14 years to seek judicial relief.

All of the claims under the TVPRA are time-barred, mandating dismissal.

## II. All of Plaintiffs' Claims Fail Because the Complaint Does Not Plausibly Allege That Defendants Knowingly or Intentionally Used Threats of Serious Harm to Obtain Labor in Violation of 18 U.S.C. § 1589(a).

Plaintiffs' claims for forced labor under 18 U.S.C. § 1589(a) (Counts I and II) should be dismissed. Even if the allegations in those Counts were true, they would not establish a TVPRA violation.

As relevant here, the TVPRA criminalizes "knowingly" obtaining "the labor or services of a person" by means of: (1) "force, threats of force, physical restraint, or threats of physical restraint to that person or another person"; (2) "serious harm or threats of serious harm to that person or another person"; or (3) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a)(1), (2), and (4). *See Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1178 (9th Cir. 2012). To establish a TVPRA violation, the defendant must have employed such means to acquire labor or services. *See Headley*, 687 F.3d at 1179; *United States v. Dann,*

652 F.3d 1160, 1169–70 (9th Cir. 2011). The term "serious harm" is objectively defined, 18 U.S.C. §

1589(c)(2). A claim under the TVPRA, therefore, requires allegations sufficient to conclude that the

defendants "*knowingly* or *intentionally* engaged in actions or made threats that were sufficiently serious

to compel a reasonable person in [Plaintiffs'] position to *remain* in [Defendants'] employ, against [their]

will and in order to avoid such threats of harm, when [they] otherwise would have left." *Muchira v. Al-*

*Rawaf*, 850 F.3d 605, 620 (4th Cir. 2017), *as amended* (Mar. 3, 2017) (emphasis in original). "[N]ot all

bad employer-employee relationships or even bad employer-immigrant … relationships will constitute

forced labor." *Dann*, 652 F.3d at 1170; *Muchira*, 850 F.3d at 620.

*Headley* is particularly instructive. The Ninth Circuit rejected TVPA[8] claims brought by former

members of the Sea Org, an "elite religious order" that functioned as the "evangelical wing" of the

Church of Scientology. 687 F.3d at 1174. Sea Org members were required "to work long hours without

material compensation, to live communally, to adhere to strict ethical standards, and to be subject to

firm discipline for ethical transgressions," including verbal reprimands, required participation in

confessionals, loss of privileges, unpleasant manual labor, a restricted diet, or expulsion. *Id.* at 1174–

76. "The Sea Org's lifestyle constraints include[d] strict policies on outside communications, marriage,

and children." *Id.* at 1175. Mail was censored, phone calls monitored, and members required to remain

with an escort while traveling outside the secured base. *Id.* at 1175, 1177. And, "[b]ecause Sea Org life

may at any moment require a member indefinitely to serve anywhere in the world, the Church

prohibit[ed] Sea Org members from having children unless they leave the order." *Id.* Wanting to leave

the order was a serious disciplinary infraction, and members who left without authorization were

tracked so the organization could send "dozens of people to locate and to try to persuade members

to return" *Id.* at 1178. Marc and Claire Headley each worked for Sea Org more than 100 hours per

---

[8] The Trafficking Victims Protection Act was reauthorized by the TVPRA in 2003 to add a civil remedy, but was otherwise substantively unchanged. *See* Pub. L. No. 108-193, Dec. 19, 2003, 117 Stat. 2875.

week, but received no compensation other than living expenses and a small weekly stipend. *Id.* at 1176. Both "experienced and observed verbal reprimands and physical abuse while in the Sea Org," and Claire was twice punished for becoming pregnant and was pushed to have abortions. *Id.*

The Ninth Circuit held that the Headleys had not shown forced labor in violation of the TVPA, since they had "joined and voluntarily worked for the Sea Org because they believed that it was the right thing to do, because they enjoyed it, and because they thought that by working they were honoring the commitment that they each made and to which they adhered." *Id.* at 1179–80. And, they were able to leave when they decided they no longer wanted to tolerate the Sea Org's membership requirements. *Id.* at 1180. Although quitting the organization meant losing their community, Sea Org was entitled to require members to adhere to their religious rules and to shun them for leaving. *Id.*

Plaintiffs Sun and Cheng cannot show a TVPRA violation here for similar reasons. Like the Headleys, "[a]lthough they alleged isolated instances of physical force," Plaintiffs ground "their forced-labor claims on the theory that [Defendants] psychologically coerced them to provide labor." *See id.* at 1178. But the most that the Complaint reveals is that Plaintiffs were students who strove to be admitted to, and then to succeed in, an elite dance academy (persevering through multiple failed auditions) with their parents' consent, hoping to advance to a very high standard of performance to further the practice of Falun Gong. Compl. ¶¶ 62–64, 93, 95. They were simply boarding-school students pursuing a religious mission. They had phones (albeit not smartphones), iPods, internet access, and stipends. *Id.* ¶¶ 46–47 78–79. As would be expected for minors attending a boarding school, they had to obtain permission to leave campus, and Plaintiffs concede that permission was sometimes granted. *Id.* ¶ 44. And the Academy provided security, *id.* ¶ 45, as is expected of a secondary school responsible for housing young students.

Requiring adherence to a school's religious beliefs (including its standards for moral conduct), restricting media consumption to that consistent with the school's faith, and regulating interaction

between the sexes (*see, e.g.*, Compl. ¶¶ 46–49, 51) are common policies in religious schools of many faiths. *See, e.g.*, *Hyman v. Rosenbaum Yeshiva of N. Jersey*, 474 N.J. Super. 561, 565 (App. Div. 2023) ("One defining feature of Orthodox Judaism that [a Yeshiva] embraces is its commitment to specific principles of behavior and conduct such as restrictions on physical contact between unrelated people of different genders.").

The Constitution protects the right of a religious school to educate students according to its faith. *See Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 780, 784–87 (2022); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753–54 (2020) ("[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school."); *Wisconsin v. Yoder*, 406 U.S. 205, 217–18 (1972).

Regulating media (including social media) use and consumption, smartphones, video games, and pornography (*see* Compl. ¶¶ 46, 51, 53, 88) are also common parenting tools, which a secondary school would naturally employ when acting *in loco parentis. See generally Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 187 (2021). Strict parenting is not coercion within the meaning of the TVPRA. *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014) ("[W]e should not – without a clear expression of Congressional intent – transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime.").

And though Plaintiffs disparage the schools' academic curricula, *see* Compl. ¶ 41, they offer no basis to conclude that their coursework is unusual among specialized performing arts schools. Plaintiffs' packed schedule (*id.* ¶¶ 70, 100) is not dissimilar from those of students competing at a high level in sports, gymnastics, or ballet. *See, e.g.*, "Day in the Life of a Ballet Student," Pittsburgh Ballet Theater (May 17, 2017), https://pbt.org/blog/day-life-ballet-student/; "What I Learned: Over 50 Olympians' Daily Routines," OWaves.com (July 29, 2024), https://owaves.com/what-i-learned-from-

researching-50-olympians/.

Moreover, the harm Plaintiffs allege that they feared was not physical or psychological: it was *religious* harm: hell, dooming others to hell, misfortune, disease, or a "fate worse than death." *See, e.g.*, Compl. ¶¶ 58, 86, 113. Concerns about the eschatological significance of Shen Yun to the audiences and performers themselves or the karmic consequences of leaving Shen Yun are quintessentially religious. The Free Exercise Clause protects a religious organization's right to operate according to its faith, and internal discipline, *See, e.g.*, *Kedroff v. Saint Nicholas Cathedral,* 344 U.S. 94, 114–16 (1952); and it may enforce compliance with its doctrine through shunning, "disfellowship," or public reprimand. Compl. ¶¶ 48, 53. *Headley*, 687 F.3d at 1180 ("A church is entitled to stop associating with someone who abandons it. … A church may also warn that it will stop associating with members who do not act in accordance with church doctrine. The former is a legitimate consequence, the latter a legitimate warning."); *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) (holding that the Free Exercise Clause protects the practice of shunning, explaining that when "[t]he members of [a] [c]hurch" "no longer want to associate with" someone who has "abandon[ed]" them, those members "are free" under the First Amendment "to make that choice").

Interpreting the TVPRA to encompass these common religious practices would not only violate the First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb-4,[9] but would criminalize the missionary activities and religious schools of major religions throughout the country. *Headley*, 687 F.3d at 1181 (noting that if the conduct at issue did constitute a TVPRA violation, the court would have to consider "whether the Act would have to be given a limiting construction to avoid constitutional problems").

---

[9] RFRA is a "super statute" that displaces the normal operation of federal legislation that imposes a substantial burden on religious exercise. *Bostock v. Clayton Cnty.,* 590 U.S. 644, 682 (2020); *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 430–31 (2006); *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006) (RFRA may be raised as an affirmative defense).

Ultimately, Plaintiffs may disagree with their parents' choice of school, but their parents had the right to direct their upbringing, including by enrolling them in institutions that would educate them consistently with their religion. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925)*; Mahmoud v. Taylor*, No. 24-297, 2025 WL 1773627, at *13 (U.S. June 27, 2025) ("[F]or many people of faith across the country, there are few religious acts more important than the religious education of their children. … The practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection from our Constitution."). As in *Headley*, Plaintiffs "joined and voluntarily" practiced and performed with Shen Yun "because they believed that it was the right thing to do … and because they thought that by [participating in Shen Yun] they were honoring" and furthering their faith. *See Headley*, 687 F.3d at 1179. Plaintiffs never indicated that they wanted to leave, and they volunteered with at least one Shen Yun presenter for years after leaving Dragon Springs. *See* Compl. ¶¶ 89, 91–92, 124–25.

"[T]he forced labor provisions of the TVPA are not intended to redress every bad employment relationship involving immigrants, or to punish immigrants for adhering to cultural rules and restrictions that many in this country would refuse to abide by." *Muchira*, 850 F.3d at 625. Nor is the TVPRA designed to criminalize strict parenting or to federalize state child abuse or tort law. *See Toviave*, 761 F.3d at 629; *see Headley*, 687 F.3d at 1181. Accordingly, there has been no "forced labor," and Plaintiffs have not adequately alleged violations of 18 U.S.C. § 1589(a).

### III. The Ministerial Exception Bars Plaintiffs' Claims.

Under the ministerial exception, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe Sch.,* 591 U.S. at 746. It prevents interference with a religious organization's independence by prohibiting government control over the appointment, engagement, or compensation of ministers.

*See id.* at 746–47; *Fratello v. Archdiocese of New York*, 863 F.3d 190, 200–02 (2d Cir. 2017).[10] It bars a wide swath of employment-related causes of action, including under wage and hour laws, *Alcazar v. Corp. of Catholic Archbishop of Seattle*, 627 F.3d 1288, 1293 (9th Cir. 2010); *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 309-11 (4th Cir. 2004), and TVPRA claims, *Headley v. Church of Scientology Int'l*, No. CV 09-3986 DSF(MANX), 2010 WL 3157064 (C.D. Cal. Aug. 5, 2010), *aff'd*, 687 F.3d 1173 (9th Cir. 2012) (holding that the ministerial exception barred a minister's TVPRA claims).

A "minister," as that term is used within the ministerial exception, is not limited to a pastor or priest. It includes anyone who communicates a religious message on behalf of a religious organization. *Our Lady of Guadalupe Sch.*, 591 U.S. at 753; *Fratello*, 863 F.3d at 208–09 ("Although [a school principal's] formal title was not inherently religious, … she performed many significant religious functions to advance its religious mission. She was thus a 'minister' for purposes of the exception."); *Alicea–Hernandez v. Cath. Bishop of Chi.*, 320 F.3d 698, 704 (7th Cir. 2003) (holding that a church's communications manager was a minister because she was "a liaison between the Church and the community" and was "integral in shaping the message that the church presented.").

A minister may convey the religious message through performance art. "[M]usic is an integral part of many different religious traditions" and "a vital means of expressing and celebrating those beliefs which a religious community holds most sacred." *EEOC v. Diocese of Raleigh*, 213 F.3d 795, 802 (4th Cir. 2000). "'[D]etermination of whose voice speaks for the church is *per se* a religious matter.'…This is no less true when the voice that speaks is the voice of song." *Id.* at 805 (quoting *Minker v. Balt. Annual Conference of the United Methodist Church*, 894 F.2d 1354, 1356 (D.C. Cir. 1990)). The same principle applies to dance, as the court may not "privilege modes of religious expression that draw

---

[10] Although the ministerial exception is sometimes characterized as an affirmative defense, "a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint.," as it does here. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

principally from the rational faculties, such as preaching or the teaching of theology, over those which summon the more lyrical elements of the human spirit." *Diocese of Raleigh,* 213 F.3d at 805. Courts consistently apply the ministerial exception to individuals engaged in religious musical performance. *See, e.g.*, *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1040–41 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012) (ministerial exception covered church organist); *Starkman v. Evans,* 198 F.3d 173, 176 (5th Cir. 1999) (choir director fell within the ministerial exception because "religious music plays a highly important role in the spiritual mission of the church"); *Martin v. SS. Columba-Brigid Cath. Church*, No. 1:21-CV-491, 2022 WL 3348382 at *6–7 (W.D.N.Y. Aug. 12, 2022) (dismissing choir director's employment discrimination claims against church because she "performed duties with a significant religious dimension").

Shen Yun is a Falun Gong evangelistic ministry, which uses performance art to share religious principles with the world, and its performers are therefore ministers under the First Amendment. Plaintiffs go to great pains to conceal the religious nature of Falun Gong and the religious mission of Shen Yun and the Fei Tian schools. For example, the Complaint quotes part of Shen Yun's mission statement (at ¶ 33) but conveniently omits the religiously-inspired remainder of the paragraph: "to carry forward the goodness of [Falun Gong] and [the] universal principle[s] of Truth, Compassion, and Forbearance." *See* SY 990. Indeed, Shen Yun performances are designed to offer spiritual salvation to the audience. Compl. ¶ 58. The Complaint itself demonstrates that Shen Yun and the Fei Tian schools are centered around Falun Gong beliefs and that Plaintiffs' parents enrolled them in Fei Tian Academy for that reason. *See, e.g.*, *id.* ¶¶ 62–63, 70, 93, 95–96. The religious mission of Shen Yun was important for their parents and for Plaintiffs, and they persevered through multiple failed attempts to join Shen Yun and thereby to play a "crucial" role in spreading Falun Gong. *Id.* ¶¶ 62–64; 93–98.

The allegation that "according to many of Hongzhi Li's statements, Falun Gong is not a religion," Compl. ¶ 35, is unsupported and, in any event, irrelevant. Whether a belief system is a religion under

U.S. law is a question of function, not characterization, as cases involving Falun Gong practitioners recognize. *See Zhang*, 311 F. Supp. 3d at 559–60 ("Falun Gong is closely related to, and can be considered a sect of, Buddhism. … Falun Gong's founder's claim that it is not a religion is based on differing concepts of religion in China and the United States. In China, religion is often defined by formalities, such as state recognition, fixed places of worship, and clergy. Falun Gong is mostly practiced individually, without the characteristics associated with religious practice in China."). *See also Malnak v. Yogi*, 592 F.2d 197, 213–14 (3d Cir. 1979) (Adams, J., concurring) (concluding that the Science of Creative Intelligence-Transcendental Meditation was a religion under the First Amendment despite the contrary statements of its leaders); *Int'l Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 439–40 (2d Cir. 1981) ("[N]on-theistic belief-systems are commonly recognized as 'religions,' including Buddhism, Taoism, Ethical Culture, and Secular Humanism.") (citing *Torcaso v. Watkins*, 367 U.S. 488, 495 (1961)); *EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 394–95 (E.D.N.Y. 2016) ("That an individual or entity purportedly holding the beliefs rejects the characterization of the beliefs as religious is not dispositive.").

That Shen Yun generates revenue in excess of expenses is consistent with both its nonprofit status and its nature as a religious organization. *See Markel v. Union of Orthodox Jewish Congregations of Am.*, 648 F. Supp. 3d 1181, 1195 (C.D. Cal. 2023), *aff'd*, 124 F.4th 796 (9th Cir. 2024) ("The OU's not-for-profit status is not invalidated simply because the OU's kosher certification division generates a profit and thereby funds its religious and advocacy missions."); *see also Shaliehsabou*, 363 F.3d at 310 ("[A]n entity can provide secular services and still have substantial religious character."). Nor is Shen Yun unique in using performance art to spread a religious faith. *See, e.g.,* The Tabernacle Choir, *Our History*, https://www.thetabernaclechoir.org/who-we-are?lang=eng; Ballet Magnificat, *Our Story*, https://www.balletmagnificat.com/about-story ("a Touring Christian Ballet company that would dance to the glory of God."). That Shen Yun performances call attention to the persecution of Falun

Gong practitioners in China, Compl. ¶¶ 35–36, also does not dilute its religious character, just as Pope (St.) John Paul II's successful opposition to the Soviet Union's oppression of Catholics did not make the Roman Catholic Church less of a religious institution. *See, e.g.*, Stephanie Slade, *The Pope Who Helped Bring Down Communism*, Reason.com (Nov. 20, 2021), https://reason.com/2021/11/20/the-pope-who-helped-bring-down-communism/.

As Justice Sotomayor explained for a unanimous Court in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industries Review Commission*, 145 S. Ct. 1583 (2025), "differentia[ting] between religions along theological lines is textbook denominational discrimination" because "such laws establish a preference for certain religions based on the content of their religious doctrine." *Id.* at 1591. Legal protections cannot turn on whether a religious organization performs certain rituals, conducts worship services, or engages in proselytizing, as such criteria "ultimately turn[] on inherently religious choices." *Id.* at 1592. The First Amendment prohibits such distinctions, "for '[t]he law knows no heresy, and is committed to the support of no dogma.'" *Id.* at 1591 (quoting *Watson v. Jones*, 80 U.S. 679 (1872)). This is particularly crucial to protect the religious liberty of minority religions, which are often little understood. *See Fratello*, 863 F.3d at 203.

For these reasons, the ministerial exception bars Plaintiffs' claims in their entirety.

## IV. Plaintiffs Fail to Meet the Pleading Requirements of Rule 8.

The Complaint also suffers from overarching pleading defects, which individually and together warrant dismissal.

### A. Plaintiffs Impermissibly Bundle All Defendants Together.

"[A]t a minimum," FRCP 8 "requires … that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)). Complaints that "lump [] all the defendants together in each claim and provide no factual basis to distinguish their

conduct" fail to satisfy this minimum standard. *Id.* Yet Plaintiffs do precisely that. They make undifferentiated claims against six individual and entity defendants, providing no specificity as to which Defendant is alleged to have done what. For example, Plaintiffs allege that "Defendants recruited children." Compl. ¶ 40. Plaintiffs never say which of the individuals and entities they have chosen to sue did this. In fact, according to the Complaint, no one "recruited" them: they were not recruited at all. Their parents wished for them to attend Fei Tian Academy, they agreed, and they auditioned repeatedly to gain admission. *See id.* ¶¶ 62–64, 93–98.

That is but one example. The Complaint consistently, throughout its lengthy narrative, recites the alleged acts of "Defendants" generically, including averments that "Defendants" "strictly enforced" an "extreme training schedule," *id.* ¶ 41; that "Defendants" told children certain things, *id.* ¶ 42; that "Defendants" "denied the child laborers medical treatment," *id.* ¶ 43; that "Defendants" collected Academy students' passports, *id.* ¶ 44; and so on, for most of the first 61 paragraphs.

Plaintiffs' improper grouping of six Defendants extends even to allegations about acts or statements allegedly directed toward Plaintiffs themselves. *See, e.g.*, Compl. ¶ 122, which informs the Court that "Defendants" told Plaintiff Cheng "that good girls did not menstruate." Did Defendant Dragon Springs Buddhist, Inc., tell her that? Did Fei Tian Academy? Did Rui Li? How? And when? This is precisely what the Second Circuit warned against in *Atuahene*, when it wrote that "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the] complaint failed to satisfy [the] minimum standard" of Rule 8. 10 F. App'x at 34.

**B. The Complaint Relies on Vague, Uncorroborated, and Obviously Inadmissible Statements Relating to Students other than Plaintiffs.**

The Complaint goes on for scores of paragraphs reciting what Plaintiffs claim to have happened to other students – whom they label "child laborers," repeating the term nearly 70 times – and not to themselves. *See, e.g.*, Compl. ¶¶ 1–6, 22–61. There is no support for any of these purportedly factual generalizations. Many of them report what was supposedly told to Plaintiffs by (unnamed) others,

with no possible verification or substantiation. They are not a proper part of a federal court complaint: they certainly do not come within the requirement of Rule 8(a)(2) that a pleading be "a short and plain statement of the claim showing that the pleader is entitled to relief."

Moreover, the Complaint's reliance on "information and belief" cannot save it. "A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). Rather, "[t]hose magic words will only make otherwise unsupported claims plausible when 'the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'" *Citizens United,* 882 F.3d at 384–85. "While a plaintiff may plead facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible, such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" *Schorr v. Dopico*, 205 F. Supp. 3d 359, 363 (S.D.N.Y. 2016), *aff'd*, 686 F. App'x 34 (2d Cir. 2017).

The Complaint's introductory paragraph states that the allegations are based upon information and belief with respect to *all* matters except "their personal knowledge of themselves and their own acts." But in no instance do Plaintiffs identify the sources of their information or a statement of facts upon which their beliefs are founded. As a result, these allegations are not entitled to a presumption of truth and are inadequate to withstand a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Moreira v. Société Générale, S.A.*, 125 F.4th 371, 395 (2d Cir. 2025).

## V. Plaintiffs' Other TVPRA Claims Fail.

All of Plaintiffs' remaining claims require a predicate § 1589(a) violation. *See* 18 U.S.C. §§ 1589(b) (Counts III, VI) (Beneficiary Liability), 1590(a) (Counts IV, V) (Trafficking in Forced Labor); 1592(a)(1) (Count VIII) (Document Seizure); 1594 (Counts VII, IX) (Attempt and Conspiracy).

Because, as shown above, Plaintiffs' §1589(a) claims (Counts I, II) (Forced Labor) are inadequate to survive a motion to dismiss, the remaining TVPRA claims must be dismissed as well.

### A.  There Was No "Forced Seizure of Documents."

Count VIII (Compl. ¶¶ 180–83) alleges that Defendants Shen Yun and Fei Tian Academy violated 18 U.S.C. § 1592, which permits a civil action against anyone who "knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document," if such conduct violated other sections of the TVPRA. This claim is without merit, as the Complaint itself reveals. Plaintiff Sun notes that his passport was kept in a safe place after he arrived at Dragon Springs in 2008, aged 15 years. Compl. ¶ 69.[11] Plaintiff Cheng's passport was handed over upon her arrival at the Academy at age 13, *id.* ¶ 99, and it was held by Shen Yun staff when she was on tour. *Id.* ¶ 113. Those references constitute the entirety of what Plaintiffs allege concerning their passports.

The Complaint does not allege that either passport was "confiscated": a word that suggests seizure under some kind of duress. Nor is there any allegation that Plaintiffs, or their parents, did not consent to the Academy acting as custodian of documents belonging to its students. Neither Plaintiff alleges that they ever requested to have their passports given to them, much less that such requests were denied. The Complaint reports that both students travelled outside the United States for dance performances (Compl. ¶¶ 72, 110): such travel obviously could not have been undertaken without passports. Nothing in the Complaint suggests that the holding of passports in an office safe – part of standard operating procedures in boarding schools housing teenaged students – was not utterly routine. It would be a highly unusual, and indeed an obviously irresponsible, residential school that would allow young students to keep documents as valuable as passports in their dormitory rooms.

---

[11] In Compl. ¶ 75, Sun informs the Court that "even as an adult, [he] was unable to keep his passport." It is not clear what this is intended to mean. It does not say that anyone took the document from him, or that he ever asked to leave and was denied access to his passport. "As an adult," he was no longer enrolled at the Academy, so presumably that Defendant is not accused of anything relevant. But Sun does not claim that Defendant Shen Yun removed his passport from him without his consent, much less refused to return it to him when requested.

The cases in which courts have cited the confiscation of documents as part of a scheme of actionable trafficking are entirely distinguishable from allegations in the Complaint. In all of those, the trafficking victims were adults, whose employers essentially made it impossible for them to escape without travel documents, despite their desire to do so. In *Cruz v. Maypa*, 773 F.3d 138, 142 (4th Cir. 2014), for instance, the employer of a domestic servant not only held her passport against her will, but lied to her about her visa status, causing her to believe that if she tried to break free of her forced isolation she would be deported or worse. But in *Muchira*, there was no TVPRA violation despite the plaintiff's employer having kept her passport, because there was no evidence that they refused to return it on request or that they intended to retain her services by holding it. 850 F.3d at 623–24.

Here, there is no allegation, much less a documented fact, that, had either Plaintiff requested return of his/her passport to permit travel to visit family, for example, or to leave the program entirely, that request would not have been honored. The Complaint is very heavy on assertions of what Plaintiffs "feared," but it is unacceptably light on specific allegations that Defendants violated the TVPRA. In any event, the claim that a boarding school's routine retention of the passports of its students constitutes "concealment" or "confiscation" within 18 U.S.C. § 1592 is untenable, and the three or four conclusory allegations to the contrary do not come close to the standard of specificity required by such controlling precedents as *Iqbal*, 556 U.S. at 678–79.

### B. The Claim of Vicarious Liability Is Not Adequately Pleaded.

In Counts II and V, Plaintiffs contend that Shen Yun is vicariously liable for the actions of Hongzhi Li. Compl. ¶¶ 138, 142, 160, 164. But the vicarious liability Counts are based solely on conclusory allegations of control and agency which are insufficient to state a claim. *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 546–47 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013) (dismissing vicarious liability claims where "except in conclusory language [plaintiffs] pled no facts as to the nature or extent of [principal-agent] relationship"). *See also id.* at 546 ("to state a claim

for vicarious liability, plaintiffs must allege that the principal manifested an intent to grant the agent authority, the agent agreed, and the principal maintain[ed] control over key aspects of the undertaking.") (quotation omitted)).

Nor do Plaintiffs adequately plead an alter-ego or veil piercing theory of liability. To pierce the corporate veil and impute liability to an individual, a plaintiff must show that the person "exercised complete domination over the corporation with respect to the transaction at issue," and "such domination was used to commit a fraud or wrong" against the plaintiff. *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp., LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)). Ignoring the separate existence of a corporation is "warranted only in extraordinary circumstances." "[C]onclusory allegations of dominance and control will not suffice to defeat a motion to dismiss." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 525 (S.D.N.Y. 2015) (quoting *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Ptnrs*, 491 B.R. 335, 347 (S.D.N.Y. 2013)).

In determining whether such a step is merited, courts in this Circuit review these factors:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*MAG Portfolio*, 268 F.3d at 63 (quoting *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1053 (2d Cir. 1997)).

These requirements are not met. Plaintiffs acknowledge that the entity Defendants are more than adequately capitalized, conceding that the second factor does not apply. *See* Compl. ¶ 31. Their claims as to the remaining criteria are unsupported. For the first factor, they say simply that "[n]one of the Defendants observe corporate formalities," Compl. ¶ 20. But this *ipse dixit* must be disregarded, *see, e.g.*, *Strojmaterialintorg v. Russian Am. Commercial Corp.*, 815 F. Supp. 103, 105 (E.D.N.Y. 1993)

(discrediting recitation of factors where the complaint "merely restates the appropriate legal standard to pierce the corporate veil"). As to the intermingling of funds, Plaintiffs similarly offer only a conclusory allegation that "Hongzhi Li and Rui Lee commingled their personal assets with" corporate property (Compl. ¶ 20), but they cite no instance where this supposedly happened, or from which it might reasonably be inferred.

Plaintiffs' attempt to support the sixth and seventh factors also fail: They merely repeat the generic and unsupported allegation that Defendants Hongzhi Li and Rui Li "control decisions" at the entity Defendants. *See, e.g.*, Compl. ¶ 17 (describing Hongzhi Li as their "leader"), *id.* ¶ 19 (reporting that Rui Li was "closely involved in [their] day-to-day operations"); *see also* ¶¶ 23, 25, 27, 29 (repeating the same threadbare allegation that Hongzhi Li "controls, directs, and manages" each of the entity Defendants and their employees). Without any factual allegations capable of demonstrating this purported control, direction, or management, however, these statements are inadequate.

Finally, while Plaintiffs do allege at least some facts on the fourth and fifth factors, their claims are still insufficient. They say that some of the entity Defendants share employees: for example, a dance instructor at one of the schools is also a tour manager for Shen Yun. *See* Compl. ¶ 30. Plaintiffs also note that the entity Defendants have the same location and mailing address. *Id.* ¶¶ 13–16.

There is no dispute that Defendants operate in a 400-acre property where different buildings are used by different related entities. *See* Compl. ¶ 28 (describing Shen Yun offices and campuses for the Academy and the College). But the sharing of real estate, or of staff, is hardly unusual for corporate entities, and is certainly insufficient to establish that any is the alter ego of another. *See, e.g., Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988) (describing shared directors in corporate structures as "commonplace," and holding that evidence of overlapping directors is insufficient to pierce the corporate veil); *Oppenheimer & Co. Inc. v. Deutsche Bank AG*, 2010 WL 743915, at *4 (S.D.N.Y. Mar. 2, 2010) (finding shared addresses and telephone numbers insufficient even when coupled with overlap

in personnel and control of operational and financial policies).

### C. The Claims of Beneficiary Liability Are Insufficient.

The TVPRA imposes liability on anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged" in forced labor under §1589(a), "knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means." 18 U.S.C. § 1589(b). The pleading deficiencies explained in Section V above cripple Plaintiffs' beneficiary liability claims, not only because they are woefully unsupported (*see, e.g.*, Compl. ¶¶ 169–70), but also because they conflate all Defendants together, with no particular Defendant's actions or intent singled out. This violates FRCP 8.

Plaintiffs speculate that individual Defendants Hongzhi Li and Rui Li have millions of dollars in assets, but they do not claim that such assets were obtained through the entity Defendants. Compl. ¶ 32. Nor does gossip based on rumor about Rui Li's fashion preferences (she "is known to have a penchant for expensive clothing and luxury brands," *id.* ¶ 32) have any probative or evidentiary value. *Cf. RCM Securities Fund, Inc. v. Stanton*, 928 F.2d 1318, 1330 (2d Cir. 1991) (explaining that an allegation of profit in a transaction is conclusory without further specifics).

### D. The TVPRA Did Not Establish Civil Liability for Conspiring or Attempting to Benefit from Forced Labor During the Relevant Time Period.

Count VII (attempting to benefit from a trafficking venture), Compl. ¶ 176, and Count IX (conspiracy, including conspiracy to benefit), *id.* ¶¶ 188–89, fail as a matter of law because Congress did not authorize these forms of civil liability until after the relevant time period. The current language of TVPRA, 18 U.S.C. §1595(a), which includes such a provision, was not added until the Abolish Trafficking Reauthorization Act of 2022, signed into law by President Biden in early 2023. Pub. L. No. 117-347 §101, 136 Stat. 6199, 6200 (2023). Congress did not specify that the amendment was to apply retroactively, and to interpret it in such a manner would impermissibly "increase a party's liability for past conduct." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994); *see also Velez v. Sanchez*, 693

23

F.3d 308, 324–25 (2d Cir. 2012) (holding that the 2008 amendment adding civil remedy provisions to TVPRA did not apply retroactively). The prior version of § 1595(a) did not authorize civil liability against defendants who attempted or conspired to benefit from trafficking, as opposed to those who "perpetrated" the crime. *See Ratha v. Phatthana Seafood Co.,* 35 F.4th 1159, 1175–76 (9th Cir. 2022). "Had Congress intended to create civil liability under §1595 for attempts to benefit, … it would have done so in express terms." *Id.*[12] Neither Plaintiff claims to have performed any work for Defendants after 2019. *See* Compl. ¶¶ 62 *et seq.* and 93 *et seq.* Because the version of TVPRA in effect when Plaintiffs were performers with Shen Yun did not provide civil liability for conspiracies or attempts to benefit from trafficking ventures, Counts VII and IX should be dismissed.

### E.  In Any Event, the Complaint Does Not Adequately Plead a Conspiracy Claim.

Count IX of the Complaint asserts a claim under 18 U.S.C. § 1594(b) for Defendants' alleged conspiracy to "recruit, harbor, and/or transport Plaintiffs to the Academy and Shen Yun" "to … obtain their forced labor." Compl. ¶ 186. Yet Plaintiffs do not adequately allege any such agreement. "Conspiracy requires an agreement to violate the prohibition on forced labor." *Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, 2021 WL 7186030, at *11 (E.D.N.Y. Apr. 30, 2021). "To support a conspiracy claim, the complaint must contain 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Baxla v. Chaudhri*, 225 F.Supp.3d 588, 594 (E.D. Va. 2016) (quoting *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 30 (D.D.C. 2016) (quoting *Twombly*, 550 U.S. at 556)). While the TVPRA does not require "proof of an explicit agreement," "the evidence must allow the jury to infer that the conspirators entered a joint enterprise and were aware of its general nature and extent." *Akhtar*, 2021 WL 7186030, at *11; *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 440 (E.D.N.Y. 2017)). "An allegation of mere parallel conduct is not enough ... [n]or are mere conclusory allegations."

---

[12] While *Ratha* specifically addressed "attempts to benefit" from a trafficking venture, the Ninth Circuit's reasoning applies with equal force to a claim for "conspiracy to benefit." Before the 2023 amendment, §1595 contained no such language.

*Baxla*, 225 F. Supp. 3d at 194 (quoting *Lagayan*, 199 F. Supp. 3d at 30, *Twombly*, 550 U.S. at 557). And since, for all of the reasons discussed in Section IV, *supra*, the Complaint does not plausibly state TVPRA violations, Defendants cannot be liable for conspiring to engage in such conduct.

**VI. Plaintiffs Lack Standing to Seek Prospective Relief.**

Finally, the Court lacks jurisdiction to award the declaratory and injunctive relief that Plaintiffs request in the last paragraph of each Count of the Complaint. "Plaintiffs must separately establish standing for each form of relief sought," *Soule v. Connecticut Ass'n of Schools, Inc.*, 90 F.4th 34, 47 (2d Cir. 2023). "[A] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). Neither Plaintiff is a current student or Shen Yun performer. Compl. ¶¶ 89, 124. There is no future injury with which they are threatened. Accordingly, they lack standing to seek those remedies, and the claims for an injunction and declaratory judgment should be dismissed for lack of subject-matter jurisdiction under FRCP 12(b)(1). *See Doe 1 v. Apple Inc.*, 96 F.4th 403, 414 (D.C. Cir. 2024).

**CONCLUSION**

For all of the foregoing reasons, the Complaint should be dismissed under FRCP 12(b)(1) and (6), with prejudice and in its entirety.

Respectfully submitted,

/s/ Steven M. Schneebaum
Steven M. Schneebaum*
Steven M. Schneebaum PC
1750 K Street NW #1210
Washington, DC 20006
sms@smslawdc.com
Telephone: (202) 742-5900

Justin E. Butterfield*
Lea E. Patterson*
Butterfield & Patterson, PLLC
P.O. Box 941681
Plano, Texas 75094
justin@butterfieldpatterson.com
lea@butterfieldpatterson.com
Telephone: (945) 284-0700

Terri Marsh**
Executive Director
Human Rights Legal Foundation
1333 New Hampshire Ave. NW.
Suite 204
Washington, DC 20036
terri.marsh.hrlf@gmail.com
Telephone: (202) 774-0893

*Counsel for Shen Yun Performing Arts, Inc., Fei Tian College, Fei Tian Academy of the Arts, Dragon Springs Buddhist Inc., Hongzhi Li, and Rui Li.*

*Admitted pro hac vice.*
*** Application for admission pro hac vice pending.*

Dated: July 7, 2025

26