UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZAN SUN and QING LING CHENG,<br><br>                    Plaintiffs,<br><br>-against-<br><br>SHEN YUN PERFORMING ARTS, INC., FEI TIAN COLLEGE, FEI TIAN ACADEMY OF THE ARTS, DRAGON SPRINGS BUDDHIST INC., HONGZHI LI, and RUI LEE,<br><br>                    Defendants. | 25-CV-3185 (JGLC)<br><br>**OPINION AND ORDER** |

JESSICA G. L. CLARKE, United States District Judge:

In countless cities across the globe, dancers soar across billboards, posters, and television screens to promote Shen Yun—a performing arts company whose stage shows dazzle audiences with depictions of "China before communism." Outside of the spotlight, however, Plaintiffs allege that Shen Yun's vibrant public image masks a darker reality: "an army of forced child laborers," they say, "endur[e] brutal conditions under the command of Shen Yun's founder, Hongzhi Li."

Plaintiffs claim they were two such laborers. For years, according to Plaintiffs, Defendants subjected them to physical and psychological abuse, isolation, and control—trapping them in a "forced labor scheme" that caused Plaintiffs extreme pain and brought Defendants substantial profits. Plaintiffs brought this case alleging forced labor, human trafficking, and related claims against Defendants under the Trafficking Victims Protection Reauthorization Act. Defendants now move to dismiss the case entirely.

Defendants advance numerous arguments to support their Motion to Dismiss, including an affirmative defense derived from the First Amendment's Religion Clauses—known as the ministerial exception—that prohibits courts from interfering with religious institutions' internal

employment decisions. But this defense, and Defendants' other arguments, are unavailing at this juncture. For the reasons explained below, the Court DENIES Defendants' Motion in its entirety.

## BACKGROUND

The following facts are, unless otherwise noted, taken from the First Amended Complaint ECF No. 36 ("FAC"), and presumed to be true for the purposes of this motion. *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

Shen Yun is a performing arts company whose majestic dance shows depict "China before communism." FAC ¶¶ 1, 43. But behind the scenes, Plaintiffs allege, Shen Yun is powered by "an army of forced child laborers"—some as young as eleven years old—who "endur[e] brutal conditions under the command of Shen Yun's founder, Hongzhi Li." ¶¶ 1, 2. Zan Sun ("Sun") and Qing Ling Cheng ("Cheng") were two such laborers. ¶ 5. They were "recruited into Defendants' forced labor scheme" at fifteen and thirteen years old, respectively. ¶¶ 5, 111. They left their homes in New Zealand to train at Shen Yun's sprawling headquarters—a 400-acre estate in Cuddebackville, New York, known as Dragon Springs. ¶¶ 28, 74, 77, 105, 111. And in the years that followed, they "endured endless working hours, serious injuries without medical care, isolation from their families, and threats of death, humiliation, and physical and psychological harm" while "perform[ing] at several hundred shows in hundreds of cities around the world." ¶ 5; *see also* ¶¶ 77, 103, 111, 136.

Now, Sun and Cheng (together, "Plaintiffs") bring this suit against Shen Yun Performing Arts, Inc. ("Shen Yun"), Fei Tian College (the "College"), Fei Tian Academy of the Arts (the "Academy"), Dragon Springs Buddhist Inc. ("Dragon Springs"), Hongzhi Li ("Li"), and Rui Lee ("Rui Lee") (collectively, "Defendants") alleging numerous violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1581 *et seq.*, and seeking compensatory

and punitive damages, restitution, preliminary and permanent injunctive relief, and attorneys' fees and costs. ¶¶ 6, 141–204.

## I.    The History of Shen Yun

Hongzhi Li founded Shen Yun in 2006. ¶ 22. A self-described "classical Chinese dance and musical company," Shen Yun performs hundreds of times per year across the United States and the world to advance its "mission" of "reviv[ing] traditional Chinese culture." ¶¶ 22, 42. Its performances combine classical Chinese dance, traditional Chinese instruments, and intricate costumes representing ancient Chinese figures with scenes depicting the—at times violent—persecution of minority Falun Gong practitioners by the ruling Chinese Communist Party. ¶¶ 37, 43.

Hongzhi Li also founded Falun Gong. ¶ 38. Plaintiffs describe Falun Gong as a political and cultural movement. *See* ¶¶ 17, 38, 41, 43. Defendants call it a religion. *See* ECF No. 37 ("MTD") at 2, 14. Whether for political, religious, or cultural reasons, Shen Yun's workers adhere to Falun Gong's teachings and practices—which integrate meditation, self-improvement, and fervent opposition to the Chinese Communist Party—and all ultimately report to Hongzhi Li himself. ¶¶ 2, 3, 23, 38, 82.

One year after founding Shen Yun, Hongzhi Li started Fei Tian Academy of the Arts. *See* ¶¶ 22, 24. The Academy is a secondary school "designed to be a feeder school for Shen Yun." ¶ 24. As Plaintiffs describe it, "[u]nder the guise of cultural education, the Academy has recruited thousands of children to provide a large, stable, forced labor market for Hongzhi Li's forced labor scheme." *Id.* Hongzhi Li hand-picks and oversees all of the Academy's employees and instructors, who train students to become Shen Yun dancers or musicians. ¶¶ 24–25.

3

In 2011, Hongzhi Li founded Fei Tian College, a post-secondary institution that is "also designed to be a feeder school for Shen Yun." ¶ 26. Similarly, as Plaintiffs describe it, "[u]nder the guise of higher education, the College has recruited thousands of children to provide a large, stable labor market for Hongzhi Li's forced labor scheme." *Id.* And again, Li oversees the College in its entirety—hand-selecting and supervising all of the College's employees, administrators, and instructors. ¶ 27.

Shen Yun, the Academy, and the College all sit on a 400-acre hilltop property in Cuddebackville, New York called Dragon Springs. ¶ 28. Offices, factories, rehearsal spaces, and dormitories dot the landscape. *Id.* Meanwhile, high fences surround, and armed guards and German shepherds patrol, the perimeter—keeping unwanted outsiders out and, according to Plaintiffs, trapping child laborers in. ¶ 28, 30, 56. Dragon Springs is colloquially known as "the Mountain." ¶ 28. There, too, Hongzhi Li controls, directs, and manages everything and everyone. ¶ 29.

Indeed, according to Plaintiffs, Hongzhi Li retains nearly complete decision-making authority at Shen Yun, the Academy, the College, and Dragon Springs. ¶ 30. "Hongzhi Li makes ultimate decisions about, for example, whether a child laborer is permitted to leave Dragon Springs, what tour groups the child laborers should be placed in, and whether any child laborer in Shen Yun should be hired, moved to a different function, or expelled." *Id.* These institutions all "act[] as a single integrated enterprise"—with Li exercising total control over their operations and personnel. ¶¶ 31–32. His wife, Rui Lee, "serv[es] as his right[-]hand lieutenant and company manager." ¶ 31.

Employees of one organization also often work for another. *Id.* For example, "a dance instructor at the Academy or College is often a tour manager at Shen Yun," while "a Shen Yun

tour manager organizes the child laborers' daily schedules at the Academy." *Id.* But all employees—at Shen Yun, the Academy, the College, and Dragon Springs—are "chosen by Hongzhi Li and act on his authority." *Id.*

## II. The "Forced Labor Scheme"

Falun Gong practitioners from around the world flock to Dragon Springs to attend the Academy and the College, hoping to one day perform in Shen Yun. ¶ 50. Many are children. *Id.* Some are as young as eleven years old. ¶ 2. But once they arrive, they cannot leave—that is when, Plaintiffs allege, "Defendants' physical and psychological control campaign" begins. *Id.*

### a. Dragon Springs

At Dragon Springs, Academy and College students spend twelve to fifteen hours training each day, at least six days per week. ¶¶ 3, 50–51. Academics, by contrast, take up only two to three hours per day. ¶ 51. That frequently leaves students with fewer than five hours of sleep each night. *Id.* "There are no sick days and medical care is forbidden." ¶ 3.

During training, Plaintiffs contend, Shen Yun dancers-in-training are subjected to "extensive abuse, including humiliation and violence." ¶ 52. Not only do dance instructors force the students' bodies "into unnatural positions," often causing injuries, but Plaintiffs allege that "[s]laps and beatings were a daily occurrence." *Id.* For female students, body shaming was the norm. *See id.* In some instances, Defendants denied students medical treatment—requiring them to "dance for over ten hours a day with torn Achilles tendons, severe back pain, and shoulder injuries." ¶ 53.

Meanwhile, Defendants "severely restricted" students' ability to leave Dragon Springs. ¶ 54. Defendants collected students' passports, locking them away in a safe. *Id.* No student could leave the premises or access their passport and immigration paperwork without permission. *Id.*

For the most part, Defendants did not allow students to leave for routine medical care, including after injuries. ¶ 55. And when adult students tried to quit or leave, Defendants resisted returning their passports. ¶ 54. On the "few occasions" that Defendants did permit students to leave, Defendants instructed them to speak only positively about their experiences, including to their parents. ¶ 55.

Defendants also strictly controlled students' access to information. ¶ 58. Defendants banned smartphones and restricted internet access to public terminals that only connected to pre-approved websites like Falun Gong's newspaper the Epoch Times. *Id.* Books, music, and other media that "did not conform to the singular perspective of Hongzhi Li and Falun Gong" were banned. *Id.* Even speaking to outsiders was discouraged. *Id.* Defendants warned that people beyond Dragon Springs' walls were "untrustworthy, mentally polluted agents of the Chinese Communist Party." *Id.* Violators were severely punished. ¶ 59.

Romance was also restricted at Dragon Springs. *See* ¶ 61. Students faced repercussions for talking to members of the opposite sex "or even looking in their direction." *Id.* "Dating could result in expulsion." *Id.* As students got older, Rui Lee would begin to pair them up—prioritizing relationships between foreign nationals and American citizens for "the most favorable immigration benefits." *Id.*

Defendants repeatedly told those assembled at Dragon Springs that "defying Hongzhi Li constituted a moral failing." ¶ 60. And because "Defendants typically recruited the children of Falun Gong practitioners like Plaintiffs who view[ed] Hongzhi Li as a moral authority," ¶ 48, or because "[t]hose few children culled from outside the Falun Gong community were quickly indoctrinated by Defendants into practicing Falun Gong and revering Hongzhi Li as the ultimate authority," *id.*, students tended to believe them. Disobeying Hongzhi Li, students were told,

6

meant losing Li's protection, rejection from the Falun Gong community, physical harm, or even death. ¶ 60.

### b. The Shen Yun Tour

"The second phase of the forced labor scheme" Plaintiffs describe "takes place around the world on the Shen Yun tour." ¶ 4. Eventually, students are selected to leave Dragon Springs and travel the world as Shen Yun dancers and musicians. ¶¶ 4, 66. On tour, they work up to fifteen hours per day and are paid approximately $500 a month. ¶ 4. Each tour lasts six months—from December to May—and includes 80 to 150 performances. ¶ 67. Each performance lasts two and a half hours. ¶ 69. At the end of each performance, the performers are directed—often by tour managers screaming into megaphones—to "confess their mistakes." ¶ 70. The performers are told their "errors w[ill] doom their audience to hell." *Id.* The tour managers then call Hongzhi Li directly to report every mistake that was made. *Id.*

The pressure to be perfect imbues performers with "deep senses of panic, anxiety, and dread." ¶ 71. According to Plaintiffs, "a child laborer attempted suicide while on the Shen Yun tour." *Id.* The tours also take a physical toll. ¶ 69. Dancers are forced to fight through "illness and injury, without exception." *Id.* They often "tumble[] and flip[] on torn tendons, sprained ankles, and broken bones." *Id.* All the while, tour managers withhold performers' passports, except when needed to pass through border crossings. ¶ 67.

The tour is also lucrative. Shen Yun, a tax-exempt 501(c)(3) organization, reported $51.5 million in revenue and approximately $266.2 million in assets in 2024. ¶¶ 34, 36. Plaintiffs suggest that that money flows directly to Hongzhi Li and Rui Lee, at the expense of the alleged child laborers. *See* ¶ 35. Meanwhile, Shen Yun often avoids paying for overnight accommodation by booking their performers on overnight bus trips. ¶ 67.

At the end of each tour, the performers return to Dragon Springs, where "the cycle of Hongzhi Li's forced labor scheme beg[ins] again." ¶ 73.

### III.  Plaintiff Sun

Plaintiff Zan Sun alleges that he was first brought into Defendants' world when he was a teenager. *See* ¶¶ 74, 77. His parents were Falun Gong practitioners and followers of Hongzhi Li. ¶ 74. In 2008, after a failed audition the year before, he auditioned for Shen Yun and was offered a three-month trial in New York. ¶ 76. He was fifteen years old. *See* ¶¶ 5, 74, 76. Sun flew from New Zealand to New York on May 10, 2008, and was dropped off at a Falun Gong parade in Queens. ¶ 77. A Falun Gong practitioner then drove him north to Dragon Springs. *Id.*

When Sun arrived, Dragon Springs was a fraction of what it is today. ¶ 78. One multi-purpose room served as a dance classroom, cafeteria, and visitors' center. *Id.* Sun was housed alongside sixteen other children in an upstairs storage space. *Id.* He could not stand up because the ceilings were too low. *Id.*

His training, however, was not as basic. ¶ 79. Plaintiffs describe it as "intense and aggressive." *Id.* Sun was immediately "forced . . . to master movements physically impossible for most people, including kicking [his] leg upward such that [his] toes reached [his] chin while in a standing position." *Id.* The month he arrived, Academy instructors "forced Sun into a side split, causing internal bleeding and several tears to his leg muscles." ¶¶ 79, 93. His legs remain scarred to this day. ¶ 93.

Sun left Dragon Springs, as planned, in early August 2008, but returned as a full-time student later that month. ¶ 81. Officials took his passport and locked it in a safe where Sun could not access it. *Id.* His return marked the beginning of a long—and demanding—Shen Yun career. Immediately, Sun's Academy training schedule required that he wake up around 5:30 in the

morning to run laps around a lake, train all day (including a maximum of three hours of academic classes, where he was allowed to cheat on his tests and nap), and return to his room between 11:00 p.m. and 2:00 a.m. to sleep—until the training started anew the next day. *See* ¶¶ 82–83.

Just months after he arrived at Dragon Springs, Sun was sent on a Shen Yun tour across the United States and Asia, which ran from December 2008 to May 2009 and consisted of 120 performances. ¶ 84. Because Sun performed in almost every scene, he danced 2.5 to 5 hours per day. *Id.* He was also required to help set up and strike all of the elaborate sets—sometimes carrying 250-pound projectors, heavy industrial cables, or massive backdrops. ¶ 86. Sun followed this routine for the next five years: He toured with Shen Yun from December to May; then, when he was not touring, he was required to train at Dragon Springs. ¶ 85; *see also* ¶ 89.

Shen Yun's physical demands took a toll. In addition to the internal bleeding Sun suffered in 2008, he sustained many injuries throughout his Shen Yun career. In or around 2010, he injured his left shoulder after an Academy instructor told him to stretch downwards while the instructor "pushed Sun's back down and forward with extreme force." ¶ 94. Although Sun needed weeks to fully recover, he was "forced to continue dancing throughout" and "still experiences pain in [that] shoulder today." *Id.* In or around 2012, Sun "began to experience severe back pain from high intensity tumbling and flexibility training." ¶ 96. He felt "sharp, stabbing sensations" and experienced a pain "so intense that sometimes he could not lift his legs or move at all." *Id.* His back pain persists to this day, and he receives regular care from a chiropractor. *Id.*

Lastly, in or around 2014, Sun tore his Achilles tendon. ¶ 97. Nevertheless, Shen Yun "required that Sun perform, which he did without missing a show." *Id.* He often had to crawl to

the bathroom to get ready in the morning. *Id.* And although several Shen Yun tour managers knew that Sun had been seriously injured, "none arranged for medical care." *Id.* "Instead, they forced him to perform." *Id.* To this day, Sun continues to experience regular pain related to this injury. *Id.*

Sun alleges that he was paid poorly for this work. While training at Dragon Springs, Sun says that he "occasionally received" cash "directly from Hongzhi Li" and that Shen Yun sent him "irregular[]" payments ranging from $100 to $500 to "pay for minor personal necessities and food." ¶ 90. While on tour, Sun attests that he was also "paid sporadically by Hongzhi Li." ¶ 91. Sun "received $100 every so often in his first year, which incrementally grew to $500 in later years." *Id.* In Sun's final months with Shen Yun, between January 2015 and May 2015, he was paid approximately $1,743 per month. *Id.*

Sun also alleges that he never felt as though he could leave Shen Yun, the Academy, or Dragon Springs. ¶ 98. "Based on Defendants' representations," Sun says that he "believed that should he leave, he would die within a month, go to hell or experience a fate even worse than hell." *Id.* Worse, he says he believed that this "harm would not only befall him, but his family too." *Id.* Sun explains that Hongzhi Li repeatedly told him that he would not survive outside of Dragon Springs—that "accidents, misfortune, or disease would kill him." *Id.* Outside of Dragon Springs, Hongzhi Li said, Sun's life would be "meaningless and he would likely die by suicide." *Id.* On one occasion, Sun tried to take back his passport from Defendants; they "compelled him to return it into their possession." ¶ 87.

Then, in or around 2014, Sun alleges that Defendants began to target him "for public humiliation." ¶ 99. He contends that Hongzhi Li and Rui Lee started "a whispering campaign" that spread rumors that Sun was going to hell. *Id.* They said that others should avoid him. *Id.* Sun

10

was "ostracized" and "isolated." *Id.* He was also "subject to additional scrutiny from Defendants": Three people were assigned to follow him everywhere and to report on his activities to Hongzhi Li and Rui Lee. *Id.*

The following year, while on tour in Barcelona, Sun posted on social media—sending Hongzhi Li into a rage. ¶ 100. Li "ordered the Shen Yun tour manager to humiliate Sun in front of the tour group." *Id.* The tour manager made Sun stay in the theater and write letters of apology, and delete his social media account. *Id.*

Later that year, on May 24, 2015, Hongzhi Li fired Sun from Shen Yun and expelled him from the College. ¶ 101. Sun later discovered that it was because "he had been caught interacting with girls." *Id.* Before Sun left Dragon Springs, Defendants "confiscated Sun's digital devices and did a full body search to ensure he was not hiding anything." *Id.* Sun then left Dragon Springs and the United States. *Id.*

Still, he remained involved in the only world he had known since he was 15. Between June 2015 and September 2015, Sun worked as a dance instructor in the Academy's Taiwan branch. ¶ 102. Plaintiffs allege that he "continued to be bullied and monitored by Defendants" there, as well. *Id.* From February 2016 to February 2018, Sun sold tickets to Shen Yun performances in New Zealand. ¶ 103. He was not paid. *Id.* And between June 2017 and March 2019, Sun worked for Vision Times, "an online newspaper controlled by Hongzhi Li and Falun Gong." ¶ 104. Again, he was not paid. *Id.*

## IV.  Plaintiff Cheng

Qing Ling Cheng makes similar allegations. Growing up, Cheng lived in New Zealand with her mother—an ardent Hongzhi Li follower and Falun Gong practitioner. ¶ 105. In or around February 2009, when Cheng was approximately twelve years old, she and her mother

11

attended a Shen Yun performance together in Auckland. *See* ¶¶ 108, 111. Backstage after the show, a Shen Yun tour manager asked Cheng to "mirror" some of the dance moves she had seen. *Id.* She did. *Id.* Later, Cheng's mother told her that she had failed her audition to join the Academy. *Id.* Nevertheless, only a few months later, in May or June, Shen Yun "told" Cheng to visit Dragon Springs for another audition. ¶ 109. Again, she did not pass. *Id.* Hongzhi Li said she was too short. *Id.*

The following year, in 2010, Cheng and her mother attended another Shen Yun performance; Cheng again auditioned backstage. ¶ 110. This time, she passed. *Id.* In June, Cheng arrived at the Academy in New York. ¶ 111. She was now thirteen years old. *Id.* When she got there, one of Defendants' employees took away her passport; it was "locked away in a safe." *Id.*

At Dragon Springs, Cheng's schedule was "rigorous," like Sun's. ¶ 112. She typically woke up between 6:00 a.m. and 7:00 a.m. *Id.* From 7:55 a.m. until about 9:00 a.m., she did Falun Gong exercises. *Id.* From 9:00 a.m. to noon, she attended academic classes. *Id.* After lunch, she trained—stopping only around 11:00 p.m. to sleep. *Id.* According to Plaintiffs, Cheng "experience[d] intense sleep deprivation" during these long days. *Id.*

Cheng was also "frequently physically assaulted by the Academy's instructors when she made mistakes or when her performance did not meet expectations." ¶ 113. Indeed, Plaintiffs allege, "[v]iolence became so commonplace [at the Academy] that the children often began crying before the instructor had even entered the room." *Id.* Academy instructors also "weighed Cheng and the other girls daily, reading out loud the names of those who weighed more than 100 pounds or failed to lose weight." ¶ 114. Cheng was regularly ridiculed about her weight. *Id.* On one occasion, Academy instructors called Cheng a "postpartum woman." *Id.*

Cheng also suffered a number of injuries while performing with Shen Yun or training at the Academy. ¶ 126. In or around 2010, soon after she had arrived at the Academy, Cheng sprained her ankle. ¶ 127. "She was not offered medical care and was required by the Academy's dance instructors to continue dancing as if nothing was wrong." *Id.* In or around 2011, Cheng was injured again. ¶ 128. She alleges that "an instructor held [her] in an upside[-]down position and stretched her left arm backwards beyond its natural range of motion." *Id.* She "lost all feeling in [that] arm and could not move it for nearly a month." *Id.* When Academy leaders—including the Academy's principal—learned of her injury, they did not arrange for medical care. ¶ 129. Instead, "Hongzhi Li ordered the principal to meditate with Cheng." *Id.* Now, Cheng's left shoulder is "permanently damaged." ¶ 131.

That same year, Cheng suffered a third injury when a dance instructor "forced Cheng's body into an unnatural position resulting in sharp and sustained back pain." Afterwards, Cheng "experienced severe back pain daily for nearly three years." ¶ 132. She explains that she "endured because Defendants told her and the other children that complaining or speaking up would be harmful." ¶ 133.

Defendants also told Cheng that "good girls did not menstruate" and that "menstruation was a sign of impurity." ¶ 134. When Cheng did begin to menstruate, she was "shamed by Academy instructors for not working hard enough." *Id.* Accordingly, Cheng "experienced major anxiety surrounding menstruation and feminine hygiene." *Id.*

All the while, the Academy failed to provide much academic training. *See* ¶ 115. For example, before one of Cheng's science classes, the instructors played a Falun Gong "documentary" that "disclaimed the necessity of understanding science." ¶ 116. Cheng's "delayed math skills" have never been addressed. ¶ 115.

13

In June 2013, when Cheng was fifteen years old, Hongzhi Li cast her to join a Shen Yun tour. ¶ 118. Then, in December of that year, at just sixteen years old, Cheng began touring with Shen Yun. ¶ 120. Her first tour, in the 2013–2014 season, traveled across the United States. ¶ 121. Cheng performed in approximately 100 shows. *Id.* She earned $400 per month. ¶ 120.

Her next tour, in 2014–2015, traveled to South America. ¶ 122. Cheng performed in approximately eighty-seven shows. *Id.* During these performances, she "felt an immense amount of pressure from Defendants not to make any mistakes." ¶ 123. When she did make a mistake, she would get "scolded via a microphone on the bus in front of the whole group" or would be otherwise "insulted" during "debriefs." *Id.* As a result, Cheng "experienc[ed] multiple panic attacks and severe anxiety, which would begin as soon as the intro[ductory] music started and the audience took their seats." *Id.*

Like Sun, Cheng also did not feel "free to leave" the organization while she was on tour. ¶ 125. Shen Yun kept her passport at all times. *Id.* Shen Yun "severely restricted" her access to the internet and to telephones. *Id.* Defendants "constantly controlled and restricted" her schedule. *Id.* Cheng "was not allowed any independent travel or excursions;" "had no opportunity to have access to the outside world in any capacity;" and "had no option to ever leave." *Id.* She "had no freedom of movement." *Id.* Defendants "constantly told" Cheng that "outsiders who were not affiliated with Defendants or Falun Gong were untrustworthy and possible [Chinese Communist Party] agents." *Id.*; *see also* ¶ 42. Cheng therefore did not seek outside help. ¶ 125. She "sincerely believed she would suffer harm if she left." *Id.* Indeed, Defendants told Cheng that leaving Shen Yun would result in "a fate worse than death." *Id.* Plaintiffs aver that the "physical and psychological control that Defendants" exerted over Cheng and other dancers "was totalizing." *Id.*

In May 2015, after her South American tour, Cheng returned to Dragon Springs. ¶ 122. On June 18, 2015, Cheng learned that Hongzhi Li had placed her tour group "on hold" and wanted them to become dance instructors. ¶ 135. A few days later, Cheng was reassigned to work in a costume factory on campus. *Id.* She was told to organize, clean, and repair some 16,000 costumes from previous Shen Yun performances. *Id.* She did so for about six months. *Id.* In November or December, Cheng was notified that she was not accepted into the College. ¶ 136. According to Plaintiffs, "Hongzhi Li determined he no longer had a need for Cheng's labor." *Id.* Cheng then returned home to New Zealand. *Id.*

From 2016 to 2018, Cheng sold tickets to Shen Yun performances in New Zealand and worked for Vision Times. ¶ 137. She was not paid for her work. *Id.*

Plaintiffs commenced this action on April 17, 2025. ECF No. 1. They properly filed their Complaint the following day, April 18, 2025. ECF No. 15. Plaintiffs then amended their Complaint on July 28, 2025. ECF No. 36. In the FAC, Plaintiffs assert the following claims:

(1) violations of the TVPRA, 18 U.S.C. §§ 1589, 1595, for forced labor against Defendants under theories of direct liability, vicarious liability, and beneficiary liability (Counts I, II, III);

(2) violations of the TVPRA, 18 U.S.C. §§ 1590, 1595, for trafficking with respect to forced labor against Defendants under theories of direct liability, vicarious liability, and beneficiary liability (Counts IV, V, and VI);

(3) violations of the TVPRA, 18 U.S.C. §§ 1589, 1594(a), and 1595, for attempted forced labor and trafficking against Defendants (Count VII);

(4) violations of the TVPRA, 18 U.S.C. §§ 1590 and 1592(a), for seizure of documents against Defendants Shen Yun and the Academy (Count VIII); and

(5) violations of the TVPRA, 18 U.S.C. §§ 1589, 1590, 1592, 1594, and 1595, for conspiracy to recruit, obtain, provide, transport, and harbor with respect to forced labor against Defendants (Count IX).

¶¶ 141–204. Plaintiffs seek declaratory relief, preliminary and permanent injunctive relief requiring Defendants to cease violating the TVPRA, compensatory and punitive damages, restitution, and attorneys' fees and costs. FAC at 39.

Before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, alongside Plaintiffs' Opposition, ECF No. 38 ("Opp."), and Defendants' Reply, ECF No. 44 ("Reply"). The Court stayed discovery pending resolution of this Motion. ECF No. 49. On May 5, 2026, the parties argued the Motion before the Court. The Court has considered their arguments closely and, for the reasons stated below, DENIES Defendants' Motion on all Counts except as it pertains to Plaintiffs' demand for declaratory and injunctive relief.

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."[1] *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere

---

[1] Unless otherwise noted, all references to a "Rule" or to the "Rules" are to the Federal Rules of Civil Procedure.

16

conclusory statements, do not suffice." *Id*. at 678 (citing *Twombly*, 550 U.S. at 555). If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

## DISCUSSION

In 2000, Congress passed the Trafficking Victims Protection Act to enforce the Thirteenth Amendment's prohibition on slavery and involuntary servitude. *See* Jennifer Mason McAward, *The Thirteenth Amendment, Human Trafficking, and Hate Crimes*, 39 Seattle U. L. Rev. 829, 831–34 (2016); *see also United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014). "The legislation created criminal offenses for forced labor and sex trafficking," *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 180 (E.D. Pa. 2020), and "was intended," in part, "to 'provide federal prosecutors with the tools to combat severe forms of worker exploitation' . . . while taking into account 'the individual circumstances of the victim." *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 437 (E.D.N.Y. 2017) (quoting H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.)) (cleaned up).

Three years later, "'Congress passed the Trafficking Victims Protection Reauthorization Act of 2003,' which, among other amendments to the previous[] law, 'created a civil right of action by victims of trafficking against their traffickers.'" *S.J. v. Choice Hotels Int'l, Inc.,* 473 F. Supp. 3d 147, 153 n.2 (E.D.N.Y. 2020) (quoting *A.B.*, 455 F. Supp. 3d at 180). Then, in 2008, Congress expanded the scope of the civil cause of action to include forced labor and added language to "g[i]ve victims a cause of action against those who have *profited* from their exploitation," not just against those who perpetrated it. *Id.* (citations omitted) (emphasis added); *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012). The statute thus provides plaintiffs a cause of action for both direct and beneficiary liability.

17

In 2023, Congress added a "Technical and Clarifying Update" to the civil cause of action—amending the statute "by inserting 'or attempts or conspires to benefit,' after 'whoever knowingly benefits.'" Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117-347, 136 Stat. 6199, 6200 (2023); *see also Ratha v. Rubicon Resources, LLC*, 168 F.4th 541, 551 (9th Cir. 2026). Accordingly, today, a victim of either forced labor or human trafficking "may bring a civil action against the perpetrator [or anyone who] knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

Plaintiffs bring claims pursuant this civil right of action, alleging claims for forced labor (Section 1589), trafficking (Section 1590), and document seizure (Section 1592), as well as for attempt and conspiracy. They also allege three theories of liability for the claims against different Defendants, including direct liability, vicarious liability, and beneficiary liability. The Court considers these claims in turn.

Before turning to the substance of Plaintiffs' claims, though, the Court assesses various procedural issues and Defendants' affirmative defense. First, the Court concludes that it cannot consider the extraneous materials Defendants submitted to support their Motion. Second, the Court analyzes Defendants' statute of limitations arguments and determines that Plaintiffs allege a continuous tort—making their claims timely at this juncture. Third, the Court finds that Plaintiffs' pleadings satisfy Rule 8's requirements. Fourth, the Court holds that the ministerial exception does not apply to TVPRA claims as alleged in this action. Fifth, the Court turns to Plaintiffs' substantive claims—and finds that all of Plaintiffs' TVPRA claims survive

Defendants' Motion to Dismiss. Finally, because Plaintiffs no longer seek prospective relief, the Court grants dismissal of this relief.

## I.  The Court Cannot and Does Not Consider Defendants' Extrinsic Materials

As part of their Motion to Dismiss, Defendants ask this Court to consider a series of extrinsic materials—including IRS letters sent to certain Defendants and references to various websites. *See* ECF No. 37-2 (exhibits); MTD at 10, 14 n.12, 15 n.13 (website references). In assessing a motion to dismiss under Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). And, as explained above, at this stage of litigation a court must accept all facts alleged in the complaint as true and draw all reasonable inferences in Plaintiffs' favor. *See Goldstein*, 516 F.3d at 56.

A court may not, however, consider documents outside of the pleadings without then converting the motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d); *see also Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) ("When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." (cleaned up)). This conversion requirement is "mandatory" and "strictly enforced." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (cleaned up). Because the Court declines to convert Defendants' Motion to Dismiss into a motion for summary judgment, it cannot—and does not—consider the extrinsic materials Defendants submitted within and attached to their Motion. *See* ECF No. 37-2; MTD at 10, 14 n.12, 15 n.13.

## II.    Plaintiffs' Claims Are Timely

Defendants argue that Plaintiffs' claims are categorically barred by the statute of limitations. But the parties agree that "[t]he TVPRA covers a 'continuing tort,' such that 'a single act occurring within the limitations period will preserve a claim based on all acts that were part of a single pattern.'" Opp. at 5 (quoting *Bensky v. Indyke*, 743 F. Supp. 3d 586, 602 (S.D.N.Y. 2024)); Reply at 4 (same). And they agree that—because Plaintiffs filed their Complaint on April 18, 2025—Plaintiffs' limitations period extends back to April 18, 2015. *See* Opp. at 5; Reply at 4.

For all of Defendants' efforts to parse Plaintiffs' timelines, then, this analysis is straightforward: Have Plaintiffs pled any acts occurring after April 18, 2015, that permit them to preserve all of their claims prior to that cutoff date? Yes, they have. Plaintiffs allege, for example, that both Sun and Cheng remained part of Shen Yun until May 2015. FAC ¶¶ 101, 122. Whether or not Sun and Cheng were actively touring at that time is immaterial; Plaintiffs clearly allege, and Defendants do not dispute, that both Sun and Cheng were active Shen Yun members who were either on tour or at Dragon Springs into the limitations period. FAC ¶¶ 101, 122; Transcript of May 5, 2026 Oral Argument ("Transcript") at 5:21–6:1; *cf.* Reply at 4. Plaintiffs plainly allege that Sun remained at Dragon Springs until late May 2015, and that Cheng stayed at Dragon Springs—"labor[ing] in Defendants' costume factory"—until December 2015. Opp. at 5; *see also* FAC ¶¶ 101, 122, 135–36. Drawing reasonable inferences in Plaintiffs' favor, Plaintiffs sufficiently allege that they remained under the same conditions detailed in the Complaint into the limitations period. That Plaintiffs did not allege a specific incident is of no moment. The acts of being subject to a grueling schedule, with little pay, while trapped at Dragon Springs through at least May 2015 are all "part of [the] single pattern" of forced labor and trafficking that is the crux of Plaintiffs' case. *Bensky*, 743 F. Supp. 3d at 602 (citation omitted).

20

The Court therefore cannot conclude as a matter of law at this juncture that Plaintiffs' claims are time-barred.[2]

### III.  Plaintiffs Meet Rule 8's Pleading Requirements

Defendants' next procedural argument—that Plaintiffs fail to meet Rule 8's pleading requirements—is equally unavailing. Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although the Rule "does not countenance pleadings that are conclusory," it only "requires factual allegations that are sufficient to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 284 (S.D.N.Y. 2024) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012)). "[T]he principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Id.* (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)). Dismissal under Rule 8, then, "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* (quoting *Salahuddin v. Cuomo*, 861 F.2d at 42)

Plaintiffs' Complaint is none of the above. Defendants have received fair notice of the claims asserted against them. Plaintiffs' tack of referring to Defendants' as a collective does not

---

[2] Plaintiffs also contend that the statute of limitations should be equitably tolled because "they did not escape Defendants' control until well after they left Dragon Springs." Opp. at 6. "Courts have credited similar explanations in finding equitable tolling at the motion to dismiss stage." *Schneider v. OSG, LLC*, No. 22-CV-7686 (AMD) (VMS), 2024 WL 1308690, at *5 n.3 (E.D.N.Y. Mar. 27, 2024) (citing *Hongxia Wang v. Enlander*, No. 17-CV-4932 (LGS), 2018 WL 1276854, at *4 (S.D.N.Y. Mar. 6, 2018)). At this stage, then, it appears as though equitable tolling is also available.

disguise Plaintiffs' claims or render them otherwise unintelligible. To the contrary, Plaintiffs consciously "refer . . . to the action of 'Defendants' as a collective whole" to assert their claims against "a unified commercial enterprise." FAC ¶¶ 31–33.

Nor do Plaintiffs' references to other Shen Yun students, or labels—such as repeatedly calling all students assembled at Dragon Springs "child laborers"—doom Plaintiffs' claims. The Court's analysis does not turn on Plaintiffs' allegedly conclusory titles. Instead, as the Court makes clear below, its analysis depends only on Plaintiffs' factual allegations. *See infra* Section V.

Therefore, the Court concludes that Plaintiffs' pleadings satisfy Rule 8's liberal requirements.

## IV.    The Ministerial Exception Does Not Apply Here

Next, Defendants contend that an affirmative defense derived from the First Amendment's Religion Clauses—known as the ministerial exception—protects them against Plaintiffs' TVPRA claims. MTD at 12–16. But this exception, which is meant to prohibit courts from interfering with a religious institution's employment decisions, does not apply to Plaintiffs' TVPRA claims as alleged.

The Court first assumes without deciding that the relevant Defendants are religious institutions such that the ministerial exception could apply. The ministerial exception applies to religious, not secular, institutions, and the parties dispute whether Falun Gong—the belief system to which Defendants adhere—is a religion. Defendants argue that because Falun Gong is a "religion," Dragon Springs is a "church," Shen Yun is Falun Gong's "evangelistic ministry," and Plaintiffs were its "ministers" who used "performance art to share religious principles and the prospect of salvation with the world," the ministerial exception bars all of Plaintiffs' claims.

22

MTD at 14; Reply at 8; *see also* MTD at 12–16. Defendants stress, in particular, that Plaintiffs are "ministers" within the meaning of the ministerial exception because Shen Yun is "religiously affiliated" and "integrates religious practice with expressive performance designed to communicate a spiritual message of salvation." Reply at 8 (quoting *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 425 (2d Cir. 2018)). Like a church organist "who 'just played the notes on the sheet music,'" Reply at 9 (quoting *Sterlinski v. Catholic Bishop of Chicago*, 934 F.3d 568, 570 (7th Cir. 2019)), Defendants argue that Plaintiffs are covered by the ministerial exception because they "personif[ied] a faith's message in outward-facing functions," Reply at 9 (citation and internal quotation marks omitted). Plaintiffs counter that none of the Defendants are religious institutions and that Falun Gong is not a religion. FAC ¶¶ 39–43.

The Court, however, need not decide this dispute—even if it could on a motion to dismiss. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 742, 745 (2020) (ruling on the ministerial exception on summary judgment); *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 180 (2012) (same); *Sterlinski*, 934 F.3d at 569 (same); *Penn*, 884 F.3d at 422 (same). "End[ing] the discussion" before any debate about whether Falun Gong is a "religion," Shen Yun is "religious," or Plaintiffs are "ministers" is necessary, the Court concludes, for the reasons explained herein, that the ministerial exception does not apply to Plaintiffs' claims as alleged under the TVPRA. Transcript at 42:22–25.

The ministerial exception is rooted in the First Amendment, which states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Religion Clauses of the Amendment "protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without

government intrusion." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746 (quoting *Hosanna-Tabor*, 565 U.S. at 186).

This independence, the Supreme Court has explained, is "closely linked" to religious institutions' "independence in . . . 'matters of church government.'" *Id.* (citation omitted). "And a component of [that] autonomy is the selection of the individuals who play certain key roles" within those institutions. *Id.* "The 'ministerial exception' was based on this insight. Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Id.*

The ministerial exception "does not mean that religious institutions enjoy a general immunity from secular laws," however. *Id.* Instead, the exception is limited: It "protect[s]" religious institutions' "autonomy with respect to internal management decisions that are essential to [their] central mission." *Id.* A "church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities," the Supreme Court has counseled. *Id.* at 747. That is because "the general principle of church autonomy" rests on the "constitutional foundation" that religious institutions must have "independence in matters of faith and doctrine" and in "closely linked matters of internal government." *Id.*

Accordingly, the ministerial exception has been applied to Title VII employment discrimination claims, *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316 (4th Cir. 2024); *Fratello v. Archdiocese of New York*, 863 F.3d 190 (2d Cir. 2017), hostile work environment claims, *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968 (7th Cir. 2021); *Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238 (10th Cir. 2010), and employment contract claims, *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113 (3d Cir. 2018), among other

24

workplace disputes. The Circuits are split on how far this exception should apply. *See Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 963–65 (9th Cir. 2004) (explaining that "the Church could invoke First Amendment protection from Title VII liability" only "if it claimed doctrinal reasons for tolerating or failing to stop the sexual harassment" at issue); *see also Demkovich*, 3 F.4th at 984 ("[W]e acknowledge the split in the circuits on whether the ministerial exception covers hostile work environment claims."). But what these cases demonstrate—and what the Supreme Court has made clear—is that the purpose of this exception is to ensure religious institutions can control matters of church governance, including the selection and termination of its ministers. *See Our Lady of Guadalupe*, 591 U.S. at 746.

"[M]inisterial exception cases are, as the Supreme Court instructs, highly fact-intensive, turning on consideration of a 'variety of factors' and 'all relevant circumstances' rather than a bright-line rule or even a 'rigid formula.'" *Billard*, 101 F.4th at 333 (quoting *Our Lady of Guadalupe*, 591 U.S. at 751, 758). At their core, they look to protect the "interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Hosanna-Tabor*, 565 U.S. at 196. So, when the facts of a particular case do not implicate "matters of faith and doctrine" or "matters of internal government," the ministerial exception does not apply. *See Our Lady of Guadalupe*, 591 U.S. at 732 ("The First Amendment protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." (citation and internal quotation marks omitted)); *Brandenburg v. Greek Orthodox Archdiocese of N. Am.*, No. 20-CV-3809 (JMF), 2023 WL 2185827, at *7–13 (S.D.N.Y. Feb. 23, 2023). It is an exception, after all.

Such is the case here. As an initial matter, the Court has not found, and Defendants fail to cite, any controlling authority supporting the argument that the ministerial exception applies to

all claims brought under the TVPRA. *See* MTD at 12–16. Defendants point to only one decision, *Headley v. Church of Scientology Int'l*, No. CV 9-CV-3986 (DSF) (MAN), 2010 WL 3157064 (C.D. Cal. Aug. 5, 2010), *aff'd*, 687 F.3d 1173 (9th Cir. 2012), that explicitly applies the exception to TVPRA claims. MTD at 12. However, not only is this out-of-Circuit district court ruling distinguishable on the facts, *see infra* Section V.A. at 31–32, the Ninth Circuit notably affirmed the decision on other grounds and declined to "reach the question of whether the ministerial exception would bar a claim under the Act," *Headley*, 687 F.3d at 1181.

Furthermore, the specific, alleged facts of this case demonstrate that the exception does not apply. Plaintiffs' allegations of abuse, forced labor, and human trafficking do not implicate "matters of faith and doctrine" or "matters of internal government." Plaintiffs claim they were subject to grueling training and work schedules with little pay, denied medical care when injured, prevented from leaving Dragon Springs, and subjected to other forms of psychological abuse that began when they were children. Accepting these allegations as true—and even assuming that Defendants are religious institutions—Defendants still retain the authority and independence to "select, supervise, and . . . remove [their] minister[s]." *Our Lady of Guadalupe Sch.*, 591 U.S. at 747. Matters of "faith," religious "doctrine," and ecclesiastical "government" have no bearing on alleged abuse, control, and confinement in between employment decisions. "The First Amendment ministerial exception protects a religious organization's employment relationship with its ministers, from hiring to firing and the supervising in between." *Demkovich*, 3 F.4th at 985. It does not protect against the allegations of forced labor, abuse, and trafficking asserted herein. And the Court rejects the notion that addressing these allegations would interfere with Defendants' "autonomy with respect to internal management decisions that are essential to [their] central mission." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746.

Defendants' response to the allegations in this case further underscores that the ministerial exception does not apply here. Defendants, in their Motion, claim that, at most, what Plaintiffs allege they experienced is what one might expect at an elite dance academy or a boarding school. MTD at 1, 9; *see also* Opp. at 8. As described below, the Court rejects this characterization of Plaintiffs' allegations. However, to the extent Defendants intend to prove that Plaintiffs were treated in the way they characterize, the resolution of this factual dispute does not implicate matters of faith and doctrine. It does not require interference with Defendants' internal governance or even their right to choose ministers. Instead, it simply requires resolution of whether what Plaintiffs experienced amounted to abuse and forced labor; or whether it was simply a difficult experience akin to an elite dance academy or boarding school. The ministerial exception is not implicated in such a dispute.

Certainly, the Court recognizes that "[i]n a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition." *Our Lady of Guadalupe Sch.*, 591 U.S. at 757. But where, as here, Plaintiffs' claims as alleged do not implicate the matters of faith and doctrine or matters of internal government integral to the ministerial exception, those claims are not "beyond the ken of civil courts." *Billard*, 101 F.4th at 325 (quoting *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997)). Plaintiffs' TVPRA claims as alleged are therefore appropriately subject to "secular laws." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746. Plaintiffs' claims as alleged are not barred by the ministerial exception.

27

### V.  Plaintiffs' TVPRA Claims Survive

Turning to the substance of Plaintiffs' claims, the Court finds that Plaintiffs have sufficiently alleged claims under the TVPRA for (1) direct liability; (2) vicarious liability; (3) beneficiary liability; (4) document seizure; and (5) attempt and conspiracy.

### A.  Direct Liability

Plaintiffs first bring direct liability claims under the TVPRA pursuant to the statute's civil right of action, 18 U.S.C. § 1595. Plaintiffs allege claims for forced labor, under Section 1589, and human trafficking, under Section 1590.[3] *See* FAC ¶¶ 141–47 (Count I), ¶¶ 165–69 (Count IV).

As relevant to Plaintiffs' claims, Section 1589 proscribes "knowingly provid[ing] or obtain[ing] the labor or services of a person . . . by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person"; "by means of serious harm or threats of serious harm to that person or another person"; or "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a)(1), (2), (4).

Defendants argue only that Plaintiffs do not adequately allege "serious harm." MTD at 7–12. Under the TVPRA, "serious harm" means "any" physical or nonphysical harm—"including psychological, financial, or reputational harm"—that is "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid

---

[3] Plaintiffs assert their claims against various combinations of Defendants. When the Court refers generally to "Defendants," it adopts these alleged chains of liability; it does not impute potential liability to other Defendants where none has been alleged.

incurring that harm." 18 U.S.C. § 1589(c)(2). In assessing "serious harm" within the meaning of the statute, the "correct standard is a hybrid": "It requires [a] victim's 'acquiescence be objectively reasonable under the circumstances,'" *Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, No. 19-CV-1422 (WFK) (RER), 2021 WL 7186030, at *7 (E.D.N.Y. Apr. 30, 2021) (quoting *United States v. Rivera*, 799 F.3d 180, 186–87 (2d Cir. 2015)), but courts "must also consider the particular vulnerabilities of a person in the victim's position," *Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 705 (S.D.N.Y. 2022) (internal citation and quotation marks omitted). "[K]nown objective conditions that make the victim especially vulnerable to pressure, such as youth or immigrant status, bear on whether the employer obtained the labor from the employee by forbidden means." *Shukla v. Sharma*, No. 7-CV-2972 (CBA) (CLP), 2009 WL 10690810, at *10 (E.D.N.Y. Aug. 21, 2009), *report and recommendation adopted*, 2009 WL 3151109 (E.D.N.Y. Sept. 29, 2009).

Taking Plaintiffs' allegations as true and making all reasonable inferences in their favor, Plaintiffs have sufficiently alleged "serious harm" within the meaning of the TVPRA. According to the FAC, guards patrolled Dragon Springs, trapping Plaintiffs on premises. FAC ¶¶ 2, 56. Teachers and tour managers restricted Plaintiffs' access to the Internet and curtailed almost all of their contact with the outside world. *Id.* ¶¶ 57–58. Defendants prevented Plaintiffs from traveling independently, or from deviating from their demanding schedule. *Id.* ¶¶ 54, 67 Defendants took Plaintiffs' passports away and locked them in a safe.[4] *Id.* ¶ 54. Defendants withheld access to medical care. *Id.* ¶ 53. Plaintiffs believed they had "no option to ever leave." *See id.* ¶ 125.

---

[4] Although Plaintiffs do not allege any claims under 18 U.S.C. § 1589(a)(3), the Court also notes that "[c]onfiscating or threatening to confiscate a person's passport is considered an 'abuse of law or legal process' for purposes of a Section 1589 claim." *A.A. v. Omnicom Grp., Inc.*, No. 25-CV-3389 (JMF), 2026 WL 504904, at *15 (S.D.N.Y. Feb. 24, 2026) (collecting cases).

Plaintiffs detail how Defendants subjected them "to extensive abuse, including humiliation and violence." *Id.* ¶ 52. Dance instructors contorted students' bodies into "unnatural positions," "regularly" causing injuries, then denied them medical care to treat those injuries. *Id.*; *see also id.* ¶¶ 93–97. Students were forced to perform "with torn Achilles tendons, severe back pain, and shoulder injuries." *Id.* ¶ 53. Teachers "beat[]" students "daily"—then told them that "they should be thankful for being beaten." *Id.* ¶ 52; *see also id.* ¶ 113. Female students were weighed, then told "they were too fat." *Id.* ¶ 52; *see also id.* ¶ 114. Students' "grueling training schedule," meanwhile, resulted in severe sleep deprivation. *Id.* ¶¶ 82; *see also id.* ¶ 112.

Defendants also constrained Plaintiffs psychologically. Plaintiffs were young immigrants who were "especially vulnerable to pressure." *Shukla*, 2009 WL 10690810, at *10. Far removed from their families and everyone they had ever known, Plaintiffs arrived at Dragon Springs looking to Defendants for moral and spiritual guidance. *See* FAC ¶¶ 49, 77, 111. Instead, they were physically harmed and berated. *See id.* ¶¶ 52, 70, 113–14, 123, 134. They were stripped of their agency and self-worth. *See id.* They were told—and they believed—that should they leave, they would "die within a month, go to hell[,] or experience a fate even worse than hell." *Id.* ¶ 98. Outside of Shen Yun, they feared, "accidents, misfortune, or disease" awaited them. *Id.* They worried that leaving would invite these horrors upon their families. *Id.*

Contrary to what Defendants suggest, these allegations reflect far more than just "*religious* harm." MTD at 10. The physical harm, public shaming, surveillance, and debilitating control that Plaintiffs allegedly suffered at Dragon Springs and in Shen Yun were not mere fears of a tortured afterlife; they were serious harms that Plaintiffs allegedly suffered in this life. That Plaintiffs may have experienced some of these alleged harms as young adults instead of as children does not change that calculus. *Cf.* Transcript at 8:1–4, 8:25–9:7, 14:24–15:2. These were

30

not—despite Defendants' arguments to the contrary—the experiences of everyday "boarding-school students" or "elite dance academy" participants. MTD at 9. Instead, Plaintiffs' allegations reflect "serious harm" and "threats of serious harm" as contemplated by the TVPRA: those harms they suffered themselves, as well as Defendants' "scheme, plan, or pattern" that "cause[d] [Plaintiffs] to believe" that the harms befalling others would turn to them if they "did not perform [the] labor or services" Defendants demanded. 18 U.S.C. §§ 1589(a)(2), (4).

Defendants rely heavily on an out-of-circuit case, *Headley v. Church of Scientology Int'l*, to argue otherwise. 687 F.3d 1173 (9th Cir. 2012). In that case, the Ninth Circuit found that two former members of the Church of Scientology's Sea Organization had failed to marshal the necessary evidence to establish a forced labor claim on summary judgment, so the Circuit affirmed the district court's ruling in defendants' favor. *Id.* at 1179–80. But *Headley* is not binding on this Court. And, even so, it is eminently distinguishable. In *Headley*, the Ninth Circuit made clear that the plaintiffs "had innumerable opportunities to leave the defendants," *id.* at 1180: the Headleys "lived outside of the [Sea Organization's] Base and traveled freely to and from the Base almost daily"; "traveled extensively throughout the United States and to Europe"; "flew on commercial jets"; "traveled away from the Base many times to visit family"; and "had access to vehicles and to phones and the Internet," *id.* at 1176. None of that is true of Plaintiffs in this case.

Indeed, Sun and Cheng's "surrounding circumstances" as alleged—that they were young, impressionable immigrants whose connection to and contact with the outside world Defendants made sure to strictly limit—only support the Court's conclusion that Plaintiffs have sufficiently pled "serious harm" under the TVPRA. 18 U.S.C. § 1589(c)(2). Accordingly, Plaintiffs have adequately alleged that Defendants subjected them to, and threatened them with, physical and

nonphysical harm—and that "a reasonable person of the same background and in the same circumstances" would have continued to labor for Defendants "in order to avoid incurring that harm." *Id.* Plaintiffs' direct liability claim under Section 1589 survives.

Relatedly, when "a defendant violates [S]ection 1589, he also violates [S]ection 1590 if he recruited the person to perform forced labor." *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir. 2019). Section 1590 "makes it unlawful to 'knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of this chapter.'" *Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 711 (S.D.N.Y. 2022) (quoting 18 U.S.C. § 1590(a)) (cleaned up). Because Plaintiffs have "plausibly alleged claims for forced labor," then, they have "also plausibly alleged a claim for trafficking based on the allegation[s] related to [their] recruitment." *Adia*, 933 F.3d at 94; *see* 18 U.S.C. § 1590(a). Therefore, Plaintiffs' direct liability claim under Section 1590 survives.

### B. Vicarious Liability

Plaintiffs next assert forced labor and trafficking claims against Shen Yun, arguing that it is vicariously liable for the actions of Hongzhi Li. *See* FAC ¶¶ 148–57 (Count II), ¶¶ 170–79 (Count V). Defendants protest that Plaintiffs fail to allege sufficient facts to establish vicarious liability under agency, alter ego, or (reverse) veil-piercing theories of liability. MTD at 20–23. Defendants, however, do not muster much support for their agency argument—they offer only that Plaintiffs' theory is "based solely on conclusory allegations of control and agency which are insufficient to state a claim." MTD at 21.

Plaintiffs, however, offer sufficient allegations for their agency theory—allegations which, at this stage, the Court must take as true. Plaintiffs allege that Li was operating as Shen Yun's agent and "had actual and/or apparent authority to act on its behalf." Opp. at 23 (citing

32

*Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703 (2d Cir. 1996)); *see also* FAC ¶¶ 150, 154, 172, 176. And in support of that allegation, Plaintiffs highlight that the FAC "sets forth how, as founder and leader of Shen Yun, Li controlled, directed, and managed the minutiae of Shen Yun, such as hand-selecting employees and dancers in each tour group, and requiring reports on any dancers' errors after every performance." Opp. at 24 (citing FAC ¶¶ 1, 4, 18, 21–23, 70, 75, 109, 135).

Actual authority "is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (quoting *Minskoff*, 98 F.3d at 708). "The consent necessary for actual authority may be either express or implied from the parties' words and conduct as construed in light of the surrounding circumstances." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 89 (S.D.N.Y. 2010) (citation and internal quotation marks omitted). "Unlike apparent authority," however, "the question of whether actual authority exists depends upon the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship." *Id.* (citation and internal quotation marks omitted). On the other hand, "the sine qua non of an apparent authority claim is that the principal[] ha[s] communicated to a third party (here, the Plaintiffs) through its words or conduct that the agent had authority to act." *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 320 (S.D.N.Y. 2006).

The FAC is short on allegations describing Shen Yun's overt "manifestations" to Li, but it makes abundantly clear that Plaintiffs—and many other third parties—believed that Li had the authority to act on Shen Yun's behalf. *See* FAC ¶¶ 84–85, 100–01, 109, 118, 135–36. At Shen Yun, Li was the "ultimate decision-maker," and Plaintiffs did what Li said. *Id.* ¶¶ 3, 30.

33

Accordingly, at this stage of the litigation, Plaintiffs have adequately alleged that, at the very least, Li acted as Shen Yun's agent with apparent authority.

Because "'traditional vicarious liability rules' ordinarily make principals liable for acts of their agents merely when the agents act 'in the scope of their authority,'" and Plaintiffs have established that Li acted on Shen Yun's behalf with apparent authority, Plaintiffs' theory of vicarious liability against Shen Yun survives. *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 508, 517 (S.D.N.Y. 2013) (quoting *Meyer v. Holley*, 537 U.S. 280, 285 (2003)). The Court need not, therefore, address Plaintiffs' alter ego or veil-piercing theories for vicarious liability.

### C. Beneficiary Liability

Plaintiffs also adequately plead their claims for beneficiary liability. *See* FAC ¶¶ 158–64 (Count III), 180–85 (Count VI). The TVPRA extends liability to anyone who

> knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

18 U.S.C. § 1589(b).

Accordingly, for Plaintiffs to "plausibly state a claim under the financial beneficiary prong of the TVPRA," they "must plead three elements: (i) that the defendant knowingly benefited or received anything of value (ii) from participation in a venture, (iii) which the beneficiary knew or should have known has engaged in an act in violation" of Section 1589. *Khatskevich v. Shapiro*, No. 23-CV-9160 (KPF), 2025 WL 833872, at *10 (S.D.N.Y. Mar. 17, 2025) (cleaned up).

Plaintiffs contend that Defendants financially benefitted from the alleged Section 1589(a) violations described above—and that Defendants knew or should have known about those

34

alleged violations. *See* FAC ¶¶ 18, 34–36. Plaintiffs have thus stated a claim under Section 1589(b). *See Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 439 (E.D.N.Y. 2017) (concluding that because plaintiff successfully pled a claim under Section 1589(a) and alleged that "defendants financially benefitted" from those alleged violations, plaintiff stated a claim under Section 1589(b)); *Edmondson v. Raniere*, 751 F. Supp. 3d 136, 181 (E.D.N.Y. 2024) ("Given the absence of any factual record, the claim may proceed at this stage."). Therefore, this theory of liability survives.

### D. Document Seizure

Plaintiffs also state a claim for seizure of documents in violation of the TVPRA. *See* FAC ¶¶ 192–95 (Count VIII). As relevant here, Section 1592 imposes liability on anyone who "knowingly . . . removes, confiscates, or possesses any actual . . . passport" while violating, or with the intent to violate, other sections of the TVPRA. 18 U.S.C. § 1592(a). Plaintiffs plainly allege exactly that: that Defendants collected Plaintiffs' passports, locked them in a safe, and resisted returning the passports to Plaintiffs to trap them at Dragon Springs and on Shen Yun tours as forced laborers. *See* FAC ¶¶ 54, 67, 81, 87, 111, 125.

Defendants argue that Plaintiffs mischaracterize what happened—and even go so far as to say that it would have been "irresponsible" for Defendants to allow Plaintiffs, as young students, to hold onto their own passports. MTD at 20. At this stage, however, the Court must take all of Plaintiffs allegations as true, construe them liberally, and make reasonable inferences in Plaintiffs' favor. Doing so, the Court concludes that Plaintiffs have pled precisely what Section 1592 proscribes: that Defendants knowingly took Plaintiffs' passports without permission, kept them locked away, and refused to return them as part of their alleged forced labor and trafficking enterprise. Plaintiffs' Section 1592 claim survives.

35

### E.  Attempt and Conspiracy

Finally, Plaintiffs allege that, in the alternative, Defendants attempted to violate the TVPRA's forced labor (Section 1589) and trafficking (Section 1590) provisions. *See* FAC ¶¶ 186–91 (Count VII). They also allege that Defendants conspired with one another to violate those same two sections as well as Section 1592, which prohibits document seizure. *See id.* ¶¶ 196–204 (Count IX). These claims also survive.

Defendants argue that Plaintiffs' attempt and conspiracy claims fail as a matter of law "because Congress did not authorize these forms of civil liability until after the relevant time period"—but their argument is unavailing. MTD at 23. As an initial matter, Defendants appear to concede that liability for attempt and conspiracy to violate the TVPRA was, in fact, actionable during the relevant time period. They appear to only contest that "[c]onspiring or attempting to *benefit* from forced labor was not actionable" prior to Congress's 2022 amendment of the TVPRA.[5] *Id.* Reply at 13.

However, the out-of-Circuit case upon which Defendants rely to argue that Congress's 2022 amendment does not apply retroactively is no longer good law. MTD at 23–24 (citing *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1175–76 (9th Cir. 2022)). Recently, the Ninth Circuit revisited that decision and ruled en banc that the Abolish Trafficking Reauthorization Act of 2022 ("ATRA"), which added attempt and conspiracy language to Section 1595, *does* apply retroactively. *Ratha v. Rubicon Resources, LLC*, 168 F.4th 541, 549–59 (9th Cir. 2026) ("In sum, Congress intended for the ATRA to have retroactive effect."). Moreover, at least one court in this District has applied the amended TVPRA—specifically, the ATRA's "attempt[] . . . to benefit"

---

[5] President Biden signed the bill into law in 2023. *See* Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117–347, 136 Stat. 6199 (2023).

language—to events that took place prior to 2022. *See Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 396, 411–12 (S.D.N.Y. 2023) (applying the statute's attempt clause to events that took place between 2006 and 2018). Adopting the Ninth Circuit's reasoned analysis, then, this Court concludes that Congress's 2022 amendment does apply retroactively—and thus applies to Plaintiffs' claims.

Plaintiffs also plainly allege enough to establish a conspiracy. Plaintiffs plead far more than "mere parallel conduct," as Defendants contend. MTD at 25 (quoting *Baxla v. Chaudhri*, 225 F. Supp. 3d 588, 594 (E.D. Va. 2016)). Instead, they "allege facts that plausibly show that the defendants entered into a joint enterprise with consciousness of its general nature and extent." *Khatskevich*, 2025 WL 833872, at *12 (quoting *Paguirigan*, 286 F. Supp. 3d at 440); *see also* FAC ¶¶ 2–3, 6, 20–21, 24–25, 27, 29–33, 49, 56, 60, 100, 118.

Therefore, both Plaintiffs' attempt and conspiracy claims survive.

## VI.  Prospective Relief

At oral argument, Plaintiffs confirmed that they are no longer seeking prospective relief. Transcript at 61:15–19. Accordingly, the Court dismisses Plaintiffs' claims for declaratory and injunctive relief.

## CONCLUSION

Defendants' Motion to Dismiss is DENIED, except for Plaintiffs' claims for declaratory and injunctive relief, which are DISMISSED. All other claims survive.

The Court, by separate order, will refer the parties to Magistrate Judge McCarthy for discovery.

The Clerk of Court is respectfully directed to terminate ECF No. 37.


Dated: May 18, 2026
       White Plains, New York

                                        SO ORDERED.

                                        _____

                                        JESSICA G. L. CLARKE
                                        United States District Judge